**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PINPOINT WAREHOUSING, LLC, | ) | Case No. 17-31701 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**RESPONSE OF AKF2 SHOPTON LLC TO DEBTOR'S**
**MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE**

**NOW COMES** AKF2 Shopton LLC ("<u>Shopton</u>"), by and through its undersigned counsel, and responds as follows to the Debtor's Motion to Dismiss or Convert Bankruptcy Case (Dkt. 92, 02/07/18) (the "<u>Dismissal Motion</u>"):

1.      Shopton respectfully submits that this case should be converted, not dismissed.

2.      Just a few weeks shy of the four-month anniversary of its chapter 11 filing on October 17, 2017 (the "<u>Petition Date</u>") – after representing on the record that a standalone plan of reorganization would be filed before expiration of exclusivity – the Debtor announced to the Court on February 6, 2018 that, in fact, it had no ability to file a standalone plan, and instead would file a motion to dismiss or convert this case.  In the Dismissal Motion filed the next day, the Debtor conceded its revenues "are insufficient to pay its secured debt service . . . and to leave remaining funds to distribute to unsecured creditors."

3.      Section 1112(b) of the Bankruptcy Code contemplates that this Court should decide between dismissal or conversion of this Debtor's Chapter 11 case based upon "whichever is in the best interests of creditors and the estate."  In the Dismissal Motion, the Debtor asserts that dismissal would be the "preferable option for creditors overall" because dismissal allegedly would provide

the Debtor "at least a limited opportunity to work with vendors and customers to minimize their losses and potential charge-back claims."[1] The Debtor's assertion is illusory and misleading.

4.      As reflected in the Debtor's cash collateral reporting through February 3, 2018, the Debtor (a) had only $7,700 of cash on hand and (b) had not yet paid approximately $307,500 of post-petition rent obligations it had budgeted to pay in the 6-week period ending February 10, 2018.  Throughout this case the Debtor's cash revenues have been well below projected levels.  At the same time, the Debtor has consistently resisted providing additional reporting detail to enable meaningful real-time monitoring of its post-petition financial position.  As a result, the Debtor has accrued substantial unpaid post-petition debts.  Shopton is thus very skeptical, and the Court and other unsecured creditors should be equally so, that this Debtor has sufficient financial resources to sustain any meaningful level of post-dismissal operations that would afford unsecured creditors any greater recovery than might be achieved through a Chapter 7 liquidation proceeding.

5.      Shopton is the largest unsecured creditor of the Debtor's estate by a significant margin having filed a proof of claim in the amount of $1,201,746.11.[2]  Shopton's claim is based primarily upon the Debtor's rejection of a pre-petition lease of non-residential real property.  But for the limitations imposed by 11 U.S.C. §502(b)(6), Shopton's claim for damages caused by the Debtor's breach/rejection of its lease would be approximately $3,618,934.05.  If this Chapter 11 case is converted to a Chapter 7 proceeding, the Chapter 7 estate and other creditors potentially would benefit from the cap that 11 U.S.C. §502(b)(6) imposes upon Shopton's allowable

---

[1]Although the Debtor asserts this vague argument for dismissal, it also equivocates in paragraph 13 of the Dismissal Motion by suggesting that, in the event other interested parties disagree "and can demonstrate that conversion to a Chapter 7 is a superior outcome," the Debtor might not oppose conversion.  This Court should reject any such implication by the Debtor, which is not supported by any case law cited by the Debtor, that the creditors in this case bear the burden of demonstrating to the Court that conversion to Chapter 7 will produce a superior outcome.

[2] A copy of Shopton's proof of claim is attached as Exhibit A.

CHAR2\1992404v6

unsecured claim.  Conversely, if this case is dismissed, Shopton will be entitled to assert its substantially larger unsecured claim against the Debtor, which likely would dilute the pro rata share that other unsecured creditors would receive from any post-dismissal distribution.

6.      The Debtor also is a lessee under several other leases of non-residential real property.  In a Chapter 7 proceeding, damage claims from rejections of these other leases also may be reduced by the cap established by 11 U.S.C. §502(b)(6).  If so, to the extent there is to be any pro rata distribution to unsecured creditors, the Debtor's other unsecured creditors likely would be better off receiving such distributions under the Bankruptcy Code so that, to the extent applicable, the allowable claims of lessor creditors are reduced by 11 U.S.C. §502(b)(6).

7.      This Court also should be skeptical of the Debtor's unqualified and unsubstantiated assertion at paragraph 9 of the Dismissal Motion that the Debtor "has no valuable assets that are unencumbered."  A Chapter 7 trustee conceivably might reach that conclusion after a proper and expeditious investigation, but it is in the best interests of the creditors that an unbiased and well-informed Chapter 7 trustee conduct such an investigation and make an independent determination upon which the Court and creditors can rely.

8.      Although the Debtor's Schedules of Assets and Liabilities (Dkt. 53, 11/17/17) reflect the Debtor's assertion that two creditors (Sassano LE, LLC and Funding Metrics Lendini) purportedly hold blanket liens on all of the Debtor's assets, no judicial determination has been made at this point as to the scope and perfection of such asserted liens.  A trustee should be afforded at least a brief opportunity to review the proofs of claim filed by these alleged secured creditors and reach its own, independent conclusion of their validity.  Similarly, as the bar date in this case passed on February 18 and creditors have already gone through the exercise of preparing and filing their proofs of claim against the Debtor's estate, a trustee should be afforded at least a brief

opportunity to review the filed proofs of claim, which can happen promptly upon conversion. An expeditious and organized claims resolution process in one forum already familiar with the Debtor and its creditor body plainly serves the best interests of creditors seeking the prompt resolution of their respective claims – as opposed to a disorderly "race to the courthouse" situation in which the Debtor is no longer subject to this Court's oversight.

9.      Further, the Schedules reflect at least one asset – a potential breach of contract cause of action against Ballantyne Brands of "unknown" value – which perhaps might be an unencumbered asset outside the scope of a typical grant of an "all-assets" lien. While the Debtor was questioned about the potential value of this cause of action at the 341 meeting more than three months ago on November 20, and has represented that disputes between the Debtor and Ballantyne Brands allegedly were a factor that led to the chapter 11 filing, to date there is no indication of the Debtor having taken any action to investigate this potential claim. Accordingly, there is no basis to assume the Debtor would take any steps to investigate this potential claim if this case is dismissed. Instead, a chapter 7 trustee should be afforded an opportunity to conduct a prompt review of this claim, assess its potential value, and reach a reliable and independent determination.

10.      Moreover, the Debtor's Statement of Financial Affairs (Dkt. 53, 11/17/17) reveals a significant number of pre-petition transfers which conceivably could be avoidable under the Bankruptcy Code as preferential transfers or fraudulent conveyances, and which a chapter 7 trustee should have at least a brief opportunity to assess. For example:

a.      in addition to what appear to be weekly payments of $7,924 each to Sassano LE LLC throughout the 90-day preference period, the Debtor made one $25,000 payment to Sassano in each of July, August, September and October – including a $25,000 payment made on the Petition Date;

b.      the Debtor paid a total of approximately $71,000 to USPS in various round-numbered amounts ($1,000, $2,000, $3,000 and $4,000) from late July through late September of 2017, apparently satisfying all amounts due to that creditor (which appears in Schedule E/F for notice purposes only);

c.      the Debtor made a total of approximately $57,000 in payments to American Express in various payments from August through October of 2017, many of which were in round-numbered amounts ($1,000, $1,500, $2,000, $3,000 and $5,000), also apparently satisfying all amounts due to that creditor (who does not appear as a creditor in Schedule E/F);

d.      in September and October of 2017, the Debtor made two wire transfers totaling $23,850 to Accurate Operational Support, one of which occurred the day before the Debtor filed its voluntary bankruptcy petition, apparently satisfying in full the claims of this creditor (which appears in Schedule E/F for notice purposes only);

e.      the Debtor made an online payment ($17,286.11 on 09/29/17) and a phone payment ($21,110.58 on 08/14/17) to United Healthcare; and

f.      the Debtor's payroll apparently has included four members of the Gantt family – Harvey Gantt, Crystal Gantt, Sara Gantt and Zachary Gantt – many or all of whom received transfers (wages and expense reimbursements) during the year preceding the bankruptcy filing.

11.     In addition, in response to questioning by the Bankruptcy Administrator at the 341 meeting, the Debtor testified that it consummated an acquisition of a separate company approximately one year prior to the Petition Date, but noted that it had not disclosed the details regarding this transaction in the Debtor's schedules.[3]  A chapter 7 trustee should have at least a brief opportunity to look into this matter as a transaction occurring one year before the Petition Date, as to which the full details have not been adequately disclosed.

12.     To be clear, Shopton is not alleging that any of the transfers or transactions referenced in the foregoing paragraphs definitively are avoidable or otherwise actionable under the Bankruptcy Code.  Shopton does not have sufficient information to make any such allegation. Shopton respectfully submits, however, that the best interests of creditors will be served by conversion to a Chapter 7 so that a Chapter 7 trustee can undertake the appropriate prompt

---

[3] Based upon the Debtor's representations at the 341 meeting, Shopton understands that, though that acquisition, the Debtor apparently acquired certain assets such as, among other things, the Panthers Personal Seat License listed in the Debtor's schedules with a value (ascribed by the Debtor) of $65,000.

investigation and analysis with respect to these matters, which may potentially benefit unsecured creditors.

13.     Conversion also should reduce the future attorneys' fees and expenses of unsecured creditors, many of which already have incurred legal fees to participate in this bankruptcy case (including but not limited to preparing and filing proofs of claim, which would be duplicated if they must refile such claims or otherwise seek to enforce remedies in any state court action). Shopton and other creditors likely will incur greater future legal fees if this case is dismissed and they are left to pursue state court remedies, including a possible state court receivership. Conversion of this Chapter 11 case, with the resulting appointment of a Chapter 7 trustee to assess and administer claims and assets (including potential Chapter 5 recoveries and the Ballantyne Brands cause of action) appears to be the most efficient, cost-effective and equitable means of ensuring that the interests of creditors are protected.

14.     Accordingly, Shopton respectfully submits that proper consideration of the interests of all of the creditors (including a comparison between the outlook for creditors in a Chapter 7 liquidation proceeding versus a dismissal) should result in a conclusion that conversion of this case to a Chapter 7 liquidation proceeding better serves the interests of all creditors.  *See, e.g., Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240 (4th Cir. 1994) (vacating a bankruptcy court order dismissing a Chapter 11 proceeding where dismissal had been favored by a consensus of a majority of the creditors, and observing that a court's decision between dismissal or conversion should include a comparative consideration of the interests of all creditors under each alternative).  Conversion of this case to a Chapter 7 proceeding likely will benefit general unsecured creditors by, among other things: (a) reducing the damage claims of real estate lessors pursuant to 11 U.S.C. §502(b)(6); (b) ensuring the scope and validity of the liens

6

asserted by secured creditors Sassano LE LLC and Funding Metrics Lendini are investigated; (c) ensuring that the Debtor's potential breach of contract claim against Ballantyne Brands and potential avoidance actions under the Bankruptcy Code (including as to insiders) are investigated and, if appropriate, pursued by a Chapter 7 trustee; and (d) saving Shopton, and other unsecured creditors, from incurring more substantial additional future attorneys' fees and expenses in state court proceedings.

WHEREFORE, Shopton respectfully requests that this Court enter an order:

A.      Denying that part of the Dismissal Motion seeking dismissal of the Debtor's Chapter 11 case;

B.      Granting that part of the Dismissal Motion seeking conversion of the Debtor's Chapter 11 case to a Chapter 7 proceeding; and

C.      Grant Shopton and other creditors such other and further relief as the Court deems just, reasonable and proper.

This 23rd day of February, 2018.

> */s/ Zachary H. Smith*
> Zachary H. Smith
> N.C. State Bar No. 48993
> Douglas R. Ghidina
> NC State Bar No. 14109
> MOORE & VAN ALLEN PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, North Carolina 28202
> Telephone: (704) 331-1000
> Telecopy: (704) 339-1159
> Email: zacharysmith@mvalaw.com
>         douglasghidina@mvalaw.com
> *Attorneys for AKF2 Shopton LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Zachary H. Smith, do hereby certify that on the 23 day of February, 2018, I caused to be served a copy of the foregoing **RESPONSE OF AKF2 SHOPTON LLC TO DEBTOR'S MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE** to be served by this Court's CM/ECF System.

*/s/ Zachary H. Smith*
Zachary H. Smith

CHAR2\1992404v6

# EXHIBIT A

## *Proof of Claim*

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Pinpoint Warehouseing, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Western District of North Carolina |
| Case number | 17-31701 |

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

### Part 1: Identify the Claim

**1. Who is the current creditor?**

AKF2 Shopton, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Moore & Van Allen PLLC, Attn: Zachary H. Smith | AKF2 Shopton, LLC, C/O Moore & Van Allen, PLLC |
| Name | Name |
| 100 North Tryon Street, Suite 4700 | 100 North Tryon Street, Suite 4700 |
| Number Street | Number Street |
| Charlotte NC 28202 | Charlotte NC 28202 |
| City State ZIP Code | City State ZIP Code |
| Contact phone 704-331-1046 | Contact phone 704-331-1046 |
| Contact email zacharysmith@mvalaw.com | Contact email zacharysmith@mvalaw.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

---

**6.** **Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:   8   4   8   4

---

**7.** **How much is the claim?**

$ _____1,201,746.11_____ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Lease (See addendum)

---

**9.** **Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:    Security Deposit (See addendum)

**Basis for perfection:**    Possession

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**            $ _____47,360.00_____

**Amount of the claim that is secured:**    $ _____47,360.00_____

**Amount of the claim that is unsecured:**   $ ___1,154,386.11___ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ _____356,296.87_____

**Annual Interest Rate** (when case was filed) 15.00 %

☑ Fixed
☐ Variable

---

**10.** **Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ _____356,296.87_____

---

**11.** **Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: Security Deposit (See addendum)

---

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies. | $ 88,087.65 |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   01/04/2018
                    MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Matthew L. Adler |
|---|---|
| | First name              Middle name              Last name |
| Title | Authorized Signatory |
| Company | AKF2 Shopton, LLC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 21500        Biscayne Blvd., Suite 700 |
| | Number      Street |
| | Aventura                              FL          33180 |
| | City                                  State       ZIP Code |
| Contact phone | 305-392-4106 | Email | mladler@adler-partners.com |

**In re Pinpoint Warehousing, Inc., Case No. 17-31701 (Bankr. W.D.N.C. 2017)**
**Addendum to Proof of Claim of AKF2 Shopton, LLC**

This proof of claim arises in connection with:

1.  the outstanding prepetition obligations of Pinpoint Warehousing, LLC (the "Debtor") under that certain Lease Agreement (the "Lease"), dated as of August 7, 2014, between the Debtor and AKF2 Shopton, LLC (the "Landlord"), successor to Shopton Ridge B, LLC (as amended, supplemented or otherwise modified from time to time, including, without limitation, pursuant to that certain Rent Deferral Agreement, dated as of June 22, 2017, between the Debtor and Landlord (the "Deferral Agreement"));

2.  the rejection of the Lease by the Debtor pursuant to the December 5, 2017 Order Allowing Rejection of Unexpired Nonresidential Real Estate Lease [Docket No. 65] (the "Lease Rejection Order"), and rejection damages associated therewith;

3.  repairs, cleanup costs and other costs and expenses incurred by the Landlord in connection with the Debtor's use and move-out from the Premises for which the Debtor is responsible pursuant to Paragraphs 6, 10, and 11 of the Lease and applicable law (the "Repair and Cleanup Costs");

4.  post-petition, pre-rejection attorneys' fees and expenses incurred by the Landlord in connection with the enforcement of the Landlord's rights and remedies under the Lease pursuant to Paragraphs 17 and 20 of the Lease and applicable law ("Post-Petition Attorneys' Fees"); and

5.  fees and expenses incurred by Landlord in connection with Landlord's performance of its duties as a member of the Official Committee of Unsecured Creditors appointed in the Debtor's Chapter 11 case (the "Committee Member Attorneys' Fees").

Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Lease. A copy of the Lease is attached hereto as Exhibit A. A copy of the Deferral Agreement is attached hereto as Exhibit B. A copy of the assignment agreement pursuant to which Shopton Ridge B, LLC assigned the Lease to the Landlord is attached hereto as Exhibit C. Certain additional supporting documents are attached as Exhibit D as explained below.

As set forth in more detail below, the aggregate amount owed by the Debtor to the Landlord is not less than $1,201,746.11 and consists of the following:

### I.   *Amounts Owed Under Lease as of the Petition Date*

Below is an aging detail that describes the outstanding amounts due under the Lease as of the Petition Date:

| Description | Amount |
|---|---|
| Minimum Rent (May 2017) | $14,778.10 |
| Common Area Costs (June 2017) | $11,793.28 |
| Minimum Rent (June 2017) | $50,000.62 |
| Common Area Costs (July 2017) | $11,793.28 |
| Minimum Rent (July 2017) | $50,000.62 |
| Common Area Costs (August 2017) | $11,793.28 |
| Minimum Rent (August 2017) | $50,000.62 |

1

| Description | Amount |
|---|---|
| 2016 Common Area Cost Reconciliation | $18,906.66 |
| Common Area Costs (September 2017) | $11,793.28 |
| Minimum Rent (September 2017) | $50,000.62 |
| Common Area Costs (October 2017 – pro-rated) | $6,086.85 |
| Minimum Rent (October 2017 – pro-rated) | $25,806.77 |
| Late Fees | $17,186.34 |
| Interest | $11,354.72 |
| Prepetition Attorneys' Fees | $15,001.83 |
| **TOTAL** | **$356,296.87** |

The Debtor's obligations under the Lease are secured by a security deposit in the amount of $47,360.00, which is held by Landlord, and as to which Landlord reserves all rights. Thus, Landlord's prepetition unsecured claim is $308,936.87 and prepetition secured claim is $47,360.00.

## II.     *Rejection Damages*

The Lease Rejection Order provides that the Lease was rejected effective as of November 30, 2017. The Annual Rent, which includes Minimum Rental and Common Area Costs, for the one year period following the Petition Date is $757,361.59.[1]

Pursuant to 11 U.S.C. § 502(b)(6), the Landlord's rejection damages claim is $757,361.59.

## III.     *Repair and Cleanup Costs*

Pursuant to Paragraphs 6, 10, and 11 of the Lease, the Debtor is responsible for the Repair and Cleanup Costs itemized below, which amounts are entitled to administrative priority pursuant to 11 U.S.C. §§ 365(d)(3) and 507(a)(2). Documentation evidencing the Repair and Cleanup Costs is attached hereto as Exhibit D.

| Description | Amount |
|---|---|
| Office light repairs | $2,900.34 |
| Office cleaning and minor repair | $2,268.00 |
| Warehouse light repair | $3,311.54 |
| Washing windows, area cleaning and minor repair | $275.00 |
| Warehouse floors | $3,432.00 |
| Door repairs | $18,363.00 |
| Electrical | $519.75 |
| Drywall Construction | $1,645.88 |
| Glazing | $721.88 |
| Floor Finishes | $3,753.75 |
| Repaint area where exterior signage was removed | $4,173.00 |
| Neglected HVAC inspection | $2,817.00 |
| Rekeying of Front Door | $218.79 |
| **TOTAL** | **$44,399.93** |

---

[1] This figure includes prorated amounts owed for October 2017 ($29,900.27) and October 2018 ($32,603.31) and reflects the contractual rent increase commencing November 1, 2017.

CHAR2\1980005v7

### IV.    *Post-Petition Attorneys' Fees*

The Landlord is entitled to reimbursement from the Debtor for its Post-Petition Attorneys' Fees as an administrative claim pursuant to Paragraphs 17 and 20 of the Lease and 11 U.S.C. § 507(a)(2) in the amount of $38,757.47.

### V.    *Committee Member Attorneys' Fees*

Pursuant to the November 2, 2017 Order Appointing Creditors' Committee [Docket No. 34], the Landlord is a member of the Official Committee of Unsecured Creditors (the "Committee").  The Landlord is entitled to $4,930.25 as an administrative claim for the Committee Member Attorneys' Fees incurred by the Landlord in the performance of its duties and in its capacity as a member of the Committee.

### VI.    *Reservation of Rights*

The Landlord reserves the right to amend and supplement this claim and/or to file additional proofs of claim for additional claims if Landlord should deem it necessary or appropriate for any reason, including, without limitation, to provide an updated statement of amount due or for any other purpose for which a proof of claim filed in this case may be amended, including, *inter alia*, claims for administrative expenses or other claims entitled to priority.

The Landlord reserves all of its respective rights and claims against the Debtor, including, without limitation, the right to assert all defenses and counterclaims available to it under applicable law and to assert rights of reimbursement, indemnification and setoff under 11 U.S.C. § 553, as applicable.  The claims set forth herein are not subject to any valid defense, setoff, recoupment, or counterclaim.

Counsel for the Landlord specifically requests that a copy of any objection to this claim, any request for further documentation, or any action by Debtor or any other party-in-interest to estimate or disallow this claim for any purpose be sent to the Landlord's counsel at the following address: Moore & Van Allen PLLC, Attn: Zachary H. Smith, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202-4003.

The filing of this Proof of Claim shall not constitute: (i) a waiver or release of any rights of Landlord against Debtor or any other person or any property in which Landlord has an interest; (ii) an admission of any kind by Landlord; (iii) an election of remedies; or (iv) a waiver, consent or release by the Landlord of any other rights, claims, actions, defenses, setoffs or recoupments to which it is or may be entitled under agreements in law, in equity or otherwise, all of which rights, claims, actions, defenses, setoffs and recoupments are expressly reserved.

*[End of Addendum]*

# EXHIBIT A

## *Lease*

LEASE AGREEMENT


BY AND BETWEEN


SHOPTON RIDGE B, LLC


(AS LANDLORD)


AND


PINPOINT WAREHOUSING, INC.

(AS TENANT)

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "**Lease**") made and entered into as of the 7th day of August, 2014 (the "**Lease Date**"), by and between

SHOPTON RIDGE B, LLC, a Delaware limited liability company hereinafter called "**Landlord**"; and

PINPOINT WAREHOUSING, INC., a North Carolina corporation hereinafter called "**Tenant**":

## W I T N E S S E T H:

In consideration of the mutual covenants and agreements contained herein, the parties hereto agree for themselves, their successors and assigns, as follows:

1.      DESCRIPTION OF PREMISES.  Landlord hereby leases to Tenant, and Tenant hereby accepts and rents from Landlord, that certain office/warehouse space (the "**Premises**") containing approximately 102,400 rentable square feet in the building located at 3915 Shopton Road, Charlotte, NC 28217 (the "**Building**") in Shopton Ridge Business Park (the "**Business Park**"), said Building being located on a parcel of real property more particularly described on Exhibit "A" attached hereto.  The Premises are shown outlined on the building plan attached hereto as Exhibit "B".  For purposes of this Lease, Tenant's "**proportionate share**" shall be one hundred percent (100%).

2.      TERM.  The term of this Lease shall commence on September 1, 2014, and shall end at midnight on October 31, 2021 (the "**Expiration Date**"). As used herein, the term "**Lease Year**" shall mean each consecutive twelve-month period of the Lease term, beginning with the Commencement Date or any anniversary thereof. There will be a partial Lease Year at the end of the Lease term.

3.      RENTAL.  During the full term of this Lease, Tenant shall pay to Landlord, without notice, demand, reduction (except as may be applicable pursuant to Section 13 or Section 19 herein), setoff or any defense, a total rental (the "**Annual Rental**") consisting of the sum total of the following:

(a)     Minimum Rental.  Commencing on the Commencement Date and continuing through the remainder of the initial seven (7) year and two (2) month term of this Lease, Tenant shall pay an annual minimum rental (the "**Minimum Rental**") in accordance with the following table:

| Period | Monthly Amount |
|---|---|
| 9/1/14 – 6/30/15 | $27,136.00* |
| 7/1/15 – 10/31/15 | $47,360.00 |
| 11/1/15 – 10/31/16 | $48,662.40 |
| 11/1/16 – 10/31/17 | $50,000.62 |
| 11/1/17 – 10/31/18 | $51,375.63 |
| 11/1/18 – 10/31/19 | $52,916.90 |
| 11/1/19 – 10/31/20 | $54,504.41 |
| 11/1/20 – 10/31/21 | $56,139.54 |

* Subject to the terms of the Abatement Period, as set forth below.

1

The Minimum Rental shall be payable in equal monthly installments, each in advance on or before the first day of each month. If the Commencement Date is a date other than the first day of a calendar month, the Minimum Rental shall be prorated daily from such date to the first day of the next calendar month and paid on the Commencement Date.

Simultaneously with the execution of this Lease, Tenant shall pay to Landlord the sum of $37,205.33, as additional security for Tenant's performance of its obligations under this Lease (the "**Advance Rental**"). If Tenant is not then in default under this Lease, Landlord shall apply the Advance Rental to the first payment of the monthly installment of Annual Rental due pursuant to this Lease. If Tenant is then in default under this Lease, Landlord may, at its option, apply all or any part of the Advance Rental to cure the default.

Subject to the terms of this grammatical paragraph, for a period commencing September 1, 2014, and ending October 31, 2014 (the "**Abatement Period**"), Landlord will forebear the obligation of Tenant to pay (i) Tenant's share of taxes, insurance premiums and Common Area Costs (as defined below) and (ii) Minimum Rental at the rate of $3.18 per rentable square foot of the Premises per annum (collectively, the "**Abated Payments**"). The foregoing agreement by Landlord has been made relying on Tenant's agreement to fully and faithfully perform any and all of its obligations under the Lease as and when required hereby. As a result, in the event that an event of default occurs under the Lease which results in the termination of the Lease, in addition to other sums which Landlord may be entitled to under the Lease or applicable law, Tenant shall reimburse Landlord an amount equal to the Unamortized Amount (as defined below) within ten (10) days following Tenant's receipt of a written invoice therefor. The term Unamortized Amount refers to the result obtained by multiplying the Abated Payments by a fraction, the numerator of which remain or would have remained in the Lease term as of the date of the event of default, the denominator being eighty-four (84).

(b)     _Tenant's Share of Taxes_. Tenant shall pay an amount equal to Tenant's proportionate share of ad valorem taxes (or any tax hereafter imposed in lieu thereof) with respect to the Building and the Business Park. Tenant's share of taxes shall be paid as provided in subparagraph (e) below. Provided, any increase in ad valorem taxes on the Premises as a result of alterations, additions or improvements made by, for or on account of Tenant shall be reimbursed by Tenant to Landlord as Additional Rent (as defined below) within thirty (30) days after receipt of written demand therefor.

(c)     _Tenant's Share of Insurance Premiums_. Tenant shall pay an amount equal to Tenant's proportionate share of premiums charged for fire and extended coverage and liability insurance with all endorsements carried by Landlord on the Building payable for any calendar year (including any applicable partial calendar year), as well as any other insurance that Landlord may reasonably carry in connection with the Building or Business Park. Tenant's proportionate share of premiums shall be paid as provided in subparagraph (e) below.

(d)     _Tenant's Share of Common Area Operating and Maintenance Costs_. Tenant shall pay an amount equal to Tenant's proportionate share of the actual costs for operating, repairing, managing and maintaining the Building, including, but not limited to, the cost of grass mowing, shrub care and general landscaping, irrigation systems, maintenance and repair to parking and loading areas, driveways, sidewalks, exterior lighting, garbage collection and disposal from the Building, common water and sewer, common plumbing, signs, security (if any) and other facilities provided by Landlord for the benefit of the Building, the administrative costs associated therewith including management fees, and of the Building's share of the common area operating and maintenance costs for the entire Business Park (collectively, "**Common Area Costs**"). Tenant's proportionate share shall be paid as provided in subparagraph (e) below.

2

(e)     Payment of Proportionate Share.  Tenant shall pay to Landlord each month, along with Tenant's installments of Minimum Rental a sum equal to one-twelfth (1/12) of the amount estimated by Landlord (in its reasonable discretion) as Tenant's proportionate share of the taxes, insurance premiums and Common Area Costs for each calendar year during the Lease term as described in paragraphs 3(b), 3(c) and 3(d) above (such amounts, together with any other sums payable by Tenant to Landlord hereunder other than Minimum Rental being referred to as "**Additional Rent**").  Landlord will endeavor to provide Tenant with Landlord's estimate of Tenant's proportionate share of taxes, insurance premiums and Common Area Costs for the year this Lease commences within sixty (60) days after the Commencement Date and for each future upcoming calendar year on or before December 31 of each calendar year during the term hereof.  If Landlord fails to notify Tenant of Tenant's revised proportionate share amount by such date, such failure shall not be a default of this Lease, and Tenant shall continue to pay the monthly installments of the proportionate share amount last payable by Tenant until notified by Landlord of such new estimated amount.  Within a reasonable period following the end of each calendar year of the term, Landlord shall deliver to Tenant a written statement setting forth the actual amount of Tenant's proportionate share for taxes, insurance premiums and all Common Area Costs for the preceding calendar year.  Tenant shall pay the total amount of any balance due shown on such statement within thirty (30) days after its delivery.  In the event such annual costs and increases decrease for any such year, Landlord shall, at its sole election, either reimburse Tenant for any overage paid within ten (10) days after delivery of such statement, or apply the overage against the monthly installment(s) of any Annual Rental next due from Tenant until such overage has been recovered by Tenant.  For the calendar year in which this Lease commences, Tenant's proportionate share shall be prorated from the Commencement Date through December 31 of such year.  Further, Tenant shall be responsible for the payment of Tenant's proportionate share of taxes, insurance premiums and Common Area Costs for the calendar year in which this Lease term expires, prorated from January 1 thereof through the Expiration Date.  Upon the Expiration Date, Landlord may elect either (i) to require Tenant to pay any unpaid estimated Additional Rent within thirty (30) days after the Expiration Date, which estimate shall be made by Landlord based upon actual and estimated costs for such year, or (ii) to withhold the Deposit (of a portion thereof) until the exact amount payable for such Additional Rent shall have been determined, after which Landlord shall return any excess Deposit to Tenant.

(f)     Documentary Tax.  In the event that any documentary stamp tax, sales tax or any other tax or similar charge (exclusive of any income tax payable by Landlord as a result hereof) levied on the rental, leasing or letting of the Premises, whether local, state or federal, is required to be paid due to the execution hereof or otherwise with respect to this Lease or the payments due hereunder, the cost thereof shall be borne by Tenant and shall be paid promptly and prior to same becoming past due.  Tenant shall provide Landlord with copies of all paid receipts respecting such tax or charge promptly after payment of same.

(g)     Late Payment.  If any monthly installment of Minimum Rental, Additional Rent or any other sum due and payable pursuant to this Lease remains due and unpaid after said amount becomes due, Tenant shall pay as Additional Rent hereunder a late payment charge equal to five percent (5%) of the unpaid rent.  All unpaid rent and other sums of whatever nature owed by Tenant to Landlord under this Lease shall bear interest from the tenth (10th) day after the due date thereof until paid at the lesser of fifteen percent (15%) per annum or the maximum interest rate per annum allowed by law.  Acceptance by Landlord of any payment from Tenant hereunder in an amount less than that which is currently due shall in no way affect Landlord's rights under this Lease and shall in no way constitute an accord and satisfaction.

4.     DELIVERY OF POSSESSION.  Landlord will deliver the Premises to Tenant on or before the Commencement Date, with Landlord's Work (as defined in Section 1 of Exhibit "C" attached hereto) substantially completed.  If Landlord for any reason whatsoever cannot deliver possession of the Premises to Tenant on the Commencement Date as above specified, this Lease shall not be void or voidable nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom.

3

5.     ALTERATIONS AND IMPROVEMENTS BY TENANT.

(a)     Tenant shall make no structural changes respecting the Premises or the Building and shall make no changes of any kind respecting the Premises or the Building that are visible from the exterior of the Premises or the Building or which affect any Building systems. Any interior nonstructural changes or other alterations, additions, or improvements to the Premises shall be made by or on behalf of Tenant only with the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Prior to any such consent by Landlord, Tenant shall submit to Landlord reasonably detailed plans and specifications covering the proposed work. If Landlord notifies Tenant of any objections to the proposed alterations, Tenant must (i) revise the plans and specifications to the extent reasonably necessary to secure the Landlord's approval and (ii) submit such revised plans and specifications for Landlord's approval. Tenant shall thereafter have the alterations performed in accordance with the approved plans and specifications. After completion, Tenant shall deliver to Landlord an "as-built" set of plans and specifications.

(b)     Tenant is not Landlord's agent or nominee in connection with any construction activities performed by or for Tenant on the Premises and Landlord shall not be liable for the contracts or liabilities of Tenant. Tenant agrees that any damage to the Premises caused by Tenant's construction work shall be repaired at Tenant's sole cost and expense. No later than thirty (30) days after completion of any work in the Premises by Tenant (including, but not limited to, the addition of equipment, cables or any material that must be inspected), Tenant shall provide to Landlord (i) an affidavit from the general contractor performing the work that same has been substantially completed in accordance with the approved plans and specifications and that all mechanics and materialmen in connection therewith have been paid in full; (ii) a waiver of lien with respect to such construction work executed by the general contractor and each subcontractor, except as to any contractor for which Tenant has obtained a bond to pay any claims by such persons; and (iii) a certificate of occupancy from the applicable governmental authorities evidencing completion of such work in accordance all applicable laws, codes and ordinances. In the event a certificate of occupancy cannot be obtained for the Premises due to any action or inaction by Tenant, Tenant shall be in default hereunder and must immediately comply with any and all requirements to obtain a certificate of occupancy.

(c)     All alterations, additions or improvements, including without limitation all partitions, walls, railings, carpeting, floor and wall coverings and other fixtures (excluding, however, Tenant's trade fixtures as described in Section 11 below) made by, for, or at the direction of Tenant shall, when made, become the property of Landlord, at Landlord's sole election, and shall, at Landlord's sole election, remain upon the Premises at the expiration or earlier termination of this Lease.

6.     USE OF PREMISES.

(a)     Tenant shall use the Premises only for general office, warehouse, packaging and light assembly of products, and for no other purposes. Tenant shall comply with all restrictions and other matters of record, laws, ordinances, orders, regulations or zoning classifications of any lawful governmental authority, agency or other public or private regulatory authority (including insurance underwriters or rating bureaus) having jurisdiction over the Premises. Tenant shall not do any act or follow any practice relating to the Premises which shall constitute a nuisance or detract in any way from the reputation of the Building. Tenant's duties in this regard shall include allowing no unreasonable noxious or offensive odors, fumes, gases, smoke, dust, steam or vapors, or any loud or disturbing noise or vibrations to originate in or emit from the Premises.

(b)     Without limiting the generality of (a) above, and excepting only office supplies and cleaning materials used by Tenant in its ordinary day-to-day business operations (but not held for sale, storage or distribution) customarily used in facilities such as the Building, and then only to the extent same

are used, stored (but not any bulk storage), transported, and disposed of strictly in accordance with all applicable laws, regulations and manufacturer's recommendations), the Premises shall not be used for the treatment, storage, transportation to or from, use or disposal of toxic or hazardous wastes, materials, or substances, or any other substance that is prohibited, limited or regulated by any governmental or quasi-governmental authority or that, even if not so regulated, could or does pose a hazard to health and safety of the occupants of the Building or surrounding property. Notwithstanding the foregoing to the contrary, Landlord shall not unreasonably withhold its consent to Tenant's use of materials used in product assembly in the e-cigarette industry, provided that Tenant in any event shall use, store (but not store in bulk), transport, and dispose of same strictly in accordance with all applicable laws, regulations and manufacturer's recommendations.

(c)     Tenant shall exercise due care in its use and occupancy of the Premises and shall not commit or allow waste to be committed on any portion of the Premises; and at the expiration or earlier termination of this Lease, Tenant shall deliver the Premises to Landlord in as good condition on the date of completion of the Improvements in the Premises, ordinary wear and tear, fire or other casualty and acts of God alone excepted.

(d)     Tenant shall save Landlord harmless from any claims, liabilities, penalties, fines, costs, expenses or damages resulting from the failure of Tenant to comply with the provisions of this Section 6. This indemnification shall survive the termination or expiration of this Lease.

7.     TAXES.

(a)     Tenant shall pay any taxes, documentary stamps or assessments of any nature imposed or assessed upon this Lease, Tenant's occupancy of the Premises or Tenant's trade fixtures, equipment, machinery, inventory, merchandise or other personal property located on the Premises and owned by or in the custody of Tenant as promptly as all such taxes or assessments may become due and payable without any delinquency. Tenant shall provide Landlord with copies of all paid receipts respecting such tax or charge upon request by Landlord.

(b)     Landlord shall pay, subject to reimbursement from Tenant as provided in Section 3 herein, all ad valorem property taxes which are now or hereafter assessed upon the Building and the Premises, except as otherwise expressly provided in this Lease.

8.     FIRE AND EXTENDED COVERAGE INSURANCE. Landlord shall maintain and pay for commercially reasonable fire insurance, with extended coverage, covering the Building. Tenant shall not do or cause to be done or permit on the Premises or in the Building anything deemed extrahazardous on account of fire, and Tenant shall not use the Premises or the Building in any manner which will cause an increase in the premium rate for any insurance in effect on the Building or a part thereof. If, because of anything done, caused to be done, permitted or omitted by Tenant or its agent(s), contractor(s), employee(s), invitee(s), licenses(s), servant(s) subcontractor(s) or subtenant(s) the premium rate for any kind of insurance in effect on the Building or any part thereof shall be raised, Tenant shall pay Landlord on demand the amount of any such increase in premium which Landlord shall pay for such insurance and if Landlord shall demand that Tenant remedy the condition which caused any such increase in an insurance premium rate, Tenant shall remedy such condition within five (5) days after receipt of such demand. Tenant shall maintain and pay for all fire and extended coverage insurance on its contents in the Premises, including trade fixtures, equipment, machinery, merchandise or other personal property belonging to or in the custody of Tenant.

5

9.     LANDLORD'S COVENANT TO REPAIR AND REPLACE.

(a)     During the term of this Lease, Landlord shall be responsible only for repairs or replacements to the roof, exterior walls, structural members (including foundation and subflooring of the Premises) and for the central plumbing and electrical systems serving the entire Building up to the respective applicable points of entry of same into the Premises. Landlord's repairs and replacements shall be made within a reasonable time. If the need for such repairs or replacements is the result of the negligence, misconduct or intentional acts or omissions of Tenant, its agent(s), contractor(s), employee(s), invitee(s), licensee(s), servant(s), subcontractor(s) or subtenant(s) and the expense of such repairs or replacements are not fully covered and paid by Landlord's insurance, then Tenant shall pay Landlord the full amount of expenses not covered. Landlord's duty to repair or replace as prescribed in this paragraph shall be Tenant's sole remedy and shall be in lieu of all other warranties or guaranties of Landlord, express or implied.

(b)     Landlord shall not be liable for any failure to make any repairs or to perform any maintenance required of Landlord hereunder unless such failure shall persist for an unreasonable period of time after written notice from Tenant setting forth the need for such repair(s) or replacement(s) in reasonable detail has been received by Landlord (but subject in any event to the terms of Section 15 herein). Except as set forth in Section 13, there shall be no abatement of rent. There shall be no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, replacements, alterations or improvements to any portion of the Building or the Premises, or to fixtures, appurtenances and equipment therein. To the extent permitted under applicable law, Tenant waives the right to make repairs at Landlord's expense under any law, statute or ordinance now or hereafter in effect.

10.     TENANT'S COVENANT TO REPAIR.     Tenant shall be responsible for the repair, replacement and maintenance in good order and condition of all parts and components of the Premises, other than those specified for repair, replacement and maintenance by Landlord above, including without limitation the plumbing, wiring, electrical systems, HVAC system, glass and plate glass, and the equipment and machinery constituting fixtures. Tenant's duty to maintain the HVAC system shall specifically include the duty to enter into and maintain at Tenant's sole expense during the entire term of this Lease a contract(s) for the routine and periodic maintenance and regular inspection of such HVAC system, the replacement of filters as recommended and the performance of other recommended periodic servicing in accordance with applicable manufacturer's standards and recommendations. Such contract (a) shall be with a reputable contractor reasonably satisfactory to Landlord, (b) shall satisfy the requirements for routine and periodic maintenance, if any, necessary to keep all applicable manufacturer's warranties in full force and effect, and (c) shall provide that in the event this Lease expires or is earlier terminated for any reason whatsoever that said contract shall be immediately terminable by Landlord or Tenant without any cost, expense or other liability on the part of Landlord.

11.     TRADE FIXTURES AND EQUIPMENT. So long as Tenant is not in default under this Lease, any trade fixtures installed in the Premises at Tenant's expense shall remain Tenant's personal property and Tenant shall have the right at any time during the term of this Lease to remove such trade fixtures. Upon removal of any trade fixtures, Tenant shall immediately restore the Premises to substantially the same condition as they were when received by Tenant, ordinary wear and tear and acts of God alone excepted. Any trade fixtures not removed by Tenant at the expiration or an earlier termination of the Lease shall become, at Landlord's sole election, either (i) the property of Landlord, in which event Landlord shall be entitled to handle and dispose of same in any manner Landlord deems fit without any liability or obligation to Tenant or any other third party with respect thereto, or (ii) subject to Landlord's removing such property from the Premises and storing same, all at Tenant's expense and without any recourse against Landlord with respect thereto. Without limiting the generality of the foregoing, the following property shall in no event be deemed to be "trade fixtures" and Tenant shall not remove any such property from the

6

Premises under any circumstances, regardless of whether installed by Landlord or Tenant: (a) any air conditioning, air ventilating or heating fixtures or equipment, (b) any lighting fixtures or equipment, (c) any dock levelers, (d) any carpeting or other permanent floor coverings, (e) any paneling or other wall coverings, (f) plumbing fixtures and equipment or (g) permanent shelving.

12.   UTILITIES.  Tenant shall pay for all utilities or services related to its use of the Premises, including, without limitation, electricity, gas, heat, water, sewer, telephone and janitorial services and trash removal from the Premises.  To the extent that water and/or sewer usage are not separately metered for the Premises, Tenant shall pay its proportionate share of the applicable charges therefor, with such proportionate share being as defined in Section 1, and the manner for payment thereof shall be as set forth in subparagraph 3(e).  Landlord shall not be responsible for the stoppage or interruption of utilities services other than as required by its limited covenant to repair and replace set forth above, nor shall Landlord be liable for any damages caused by or from the plumbing and sewer systems.

13.   DAMAGE OR DESTRUCTION OF PREMISES.  If the Premises are damaged by fire or other casualty, but are not rendered untenantable for Tenant's business, either in whole or in part, Landlord shall cause such damage to be repaired (to the extent of Landlord's Work and the availability of insurance proceeds) without unreasonable delay and the Annual Rental shall not be abated.  If by reason of such casualty the Premises are rendered untenantable in Tenant's business, either in whole or in part, Landlord shall cause the damage to be repaired or replaced (to the extent of Landlord's Work and availability of insurance proceeds) without unreasonable delay, and, in the interim, the Annual Rental shall be proportionately reduced as to such portion of the Premises as is rendered untenantable.  Any such abatement of rent shall not, however, create an extension of the term of this Lease.  Provided, however, if by reason of such casualty, the Premises are rendered untenantable in some material portion, and the amount of time required to repair the damage using due diligence is in excess of two hundred seventy (270) days, then either party shall have the right to terminate this Lease by giving written notice of termination within sixty (60) days after the date of casualty, and the Annual Rental shall abate as of the date of such casualty in proportion to the part of the Premises rendered untenantable.  Notwithstanding the other provisions of this Section 13, in the event there should be a casualty loss to the Premises to the extent of fifty percent (50%) or more of their replacement value and the Premises are rendered untenantable for the conduct of Tenant's business operations during the last twelve (12) months of the initial Lease term or any extended term, either party may, at its option, terminate this Lease by giving written notice within sixty (60) days after the date of the casualty and rent shall abate as of the date of such notice.  Except as provided herein, Landlord shall have no obligation to rebuild or repair in case of fire or other casualty, and no termination under this Section 13 shall affect any rights of Landlord or Tenant hereunder because of prior defaults of the other party.  Tenant shall give Landlord immediate notice of any fire or other casualty in the Premises.

14.   GOVERNMENTAL ORDERS.  Tenant agrees, at its own expense, to comply promptly with all requirements of any legally constituted public authority that may be in effect from time to time.

15.   MUTUAL WAIVER OF SUBROGATION.  For the purpose of waiver of subrogation, and notwithstanding anything in this Lease to the contrary, the parties mutually release and waive unto the other all rights to claim damages, costs or expenses for any injury to property caused by a casualty of any type whatsoever in, on or about the Premises.  All insurance policies carried with respect to this Lease, if permitted under applicable law, shall contain a provision whereby the insurer waives, prior to loss, all rights of subrogation against either Landlord or Tenant.

16.   SIGNS AND ADVERTISING.

(a)   Subject to receipt of all applicable governmental approvals, Tenant may install one (1) tenant identification sign in accordance with Building standards and subject to Landlord's prior written

7

approval, such sign to be located on the exterior of the Building at or near the Tenant's front entrance to the Premises within the Building. Tenant shall submit sign drawings to Landlord for approval prior to fabrication and installation. The following submission requirements, in duplicate, constitute the minimum data required: (i) layout, size, location and color of test; (ii) layout of additional symbols or logo; (iii) installation details; and (iv) lighting details, if applicable. In the event Tenant desires any changes to its initial sign, Tenant shall reimburse Landlord for its actual legal fees, if any, and an administrative fee of $500.00 in connection with any request by Tenant for Landlord's review and approval of a new sign. Upon the expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, remove any such signage and repair any damage caused to the Building as a result thereof.

In addition to the foregoing signage, Landlord shall, at Landlord's cost and expense, install a sign indicating Tenant's suite number at the entrance to the Premises.

(b)     In order to provide architectural control for the Building, Tenant shall install no other exterior signs, marquees, billboards, outside lighting fixtures and/or other decorations on the Premises or the Building. Landlord shall have the right to remove any such sign or other decoration and restore fully the Premises at the cost and expense of Tenant if any such exterior work is done without Landlord's prior written approval, which approval Landlord shall be entitled to withhold or deny in its sole discretion. Tenant shall not permit, allow or cause to be used in, on or about the Premises any sound production devices, mechanical or moving display devices, bright lights, or other advertising media, the effect of which would be visible or audible from the exterior of the Premises.

17.     INDEMNIFICATION AND LIABILITY INSURANCE.

(a)     Tenant shall indemnify and save Landlord harmless against any and all claims, suits, demands, actions, fines, damages, and liabilities, and all costs and expenses thereof (including without limitation reasonable attorneys' fees) arising out of injury to persons (including death) or property occurring in, on or about, or arising out of the Premises or other areas in the Building if caused or occasioned wholly or in part by any act(s) or omission(s) of Tenant, its agent(s), contractor(s), employee(s), invitee(s), licensee(s), servant(s), subcontractor(s) or subtenant(s), except if caused by any act(s) or omission(s) on the part of Landlord. The non-prevailing party shall also pay all costs, expenses and reasonable attorneys' fees that may be incurred by the prevailing party in enforcing the agreements of this Lease, whether incurred as a result of litigation or otherwise. Tenant shall give Landlord immediate notice of any such happening causing injury to persons or property.

(b)     At all times during the term of this Lease, Tenant shall at its own expense keep in force adequate public liability insurance under the terms of a commercial general liability policy (occurrence coverage) in the amount of not less than $2,000,000.00 coverage and with such company(ies) licensed to do business in the state in which the Premises is located as shall from time to time be reasonably acceptable to Landlord (and to any lender having a mortgage interest in the Premises) and naming Landlord as an additional insured (and, if requested by Landlord from time to time, naming Landlord's mortgagee as an additional insured). Such insurance shall include, without limitation, personal injury and contractual liability coverage for the performance by Tenant of the indemnity agreements set forth in this Lease. Tenant shall first furnish to Landlord copies of policies or certificates of insurance evidencing the required coverage prior to the Commencement Date and thereafter prior to each policy renewal date. All policies required of Tenant hereunder shall contain a provision whereby the insurer is not allowed to cancel or change materially the coverage without first giving thirty (30) days' written notice to Landlord.

18.     LANDLORD'S RIGHT OF ENTRY. Landlord, and those persons authorized by it, shall have the right to enter the Premises at all reasonable times and upon reasonable notice (provided that (i) no prior notice is required in the event of an emergency and (ii) any such notice may be provided via e-mail or

8

telephone call to the Premises or other Tenant representative) for the purposes of making repairs, making connections, installing utilities, providing services to the Premises or for any other tenant, making inspections or showing the same to prospective purchasers and/or lenders, as well as at any time in the event of emergency involving possible injury to property or persons in or around the Premises or the Building. Further, during the last six (6) months of the initial or of any extended term, Landlord and those persons authorized by it shall have the right at reasonable times and upon reasonable notice to show the Premises to prospective tenants.

19.     **EMINENT DOMAIN.** If any substantial portion of the Premises is taken under the power of eminent domain (including any conveyance made in lieu thereof) or if such taking shall materially impair the normal operation of Tenant's business, then either party shall have the right to terminate this Lease by giving written notice of such termination within thirty (30) days after such taking. If neither party elects to terminate this Lease, Landlord shall repair and restore the Premises (to the extent possible) to substantially the same condition as the Premises existed immediately prior to such taking and the Annual Rental shall be proportionately and equitably reduced. All compensation awarded for any taking (or the proceeds of a private sale in lieu thereof) shall be the property of Landlord whether such award is for compensation for damages to the Landlord's or Tenant's interest in the Premises, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall not have any interest in any separate award made to Tenant for loss of business, moving expense or the taking of Tenant's trade fixtures or equipment if a separate award for such items is made to Tenant and if such separate award does not reduce the award to Landlord.

20.     <u>EVENTS OF DEFAULT AND REMEDIES.</u>

(a)     Upon the occurrence of any one or more of the following events (the "**Events of Default**," any one an "**Event of Default**"), Landlord shall have the right to exercise any rights or remedies available in this Lease, at law or in equity. Events of Default shall be:

(i)     Tenant's failure to pay when due any rental or other sum of money payable hereunder (provided, however, relative only to the first such delinquency in any calendar year, an Event of Default shall not be deemed to have occurred unless Landlord gives Tenant notice of such delinquency and Tenant fails to make the delinquent payment within five (5) business days of receipt of such notice);

(ii)     Failure by Tenant to perform any other of the terms, covenants or conditions contained in this Lease if not remedied within twenty (20) days after receipt of written notice thereof;

(iii)     Tenant shall become bankrupt or insolvent, or file any debtor proceedings, or file pursuant to any statute a petition in bankruptcy or insolvency or for reorganization, or file a petition for the appointment of a receiver or trustee for all or substantially all of Tenant's assets and such petition or appointment shall not have been set aside within sixty (60) days from the date of such petition or appointment, or if Tenant makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement; or

(iv)     Tenant vacates, abandons or fails to operate in the Premises or any substantial part thereof or allows its leasehold estate to be taken under any writ of execution and such writ is not vacated or set aside within thirty (30) days.

(b)     In addition to its other remedies, Landlord, upon an Event of Default by Tenant, shall have the immediate right, after any applicable grace period expressed herein, to terminate and cancel this Lease

9

and/or to reenter and remove all persons and properties from the Premises and dispose of such property as it deems fit, all without being guilty of trespass or being liable for any damages caused thereby. If Landlord reenters the Premises, it may either terminate this Lease or, from time to time without terminating this Lease, make such alterations and repairs as may be necessary or appropriate to relet the Premises and relet the Premises upon such terms and conditions as Landlord deems advisable without any responsibility on Landlord whatsoever to account to Tenant for any surplus rents collected. No retaking of possession of the Premises by Landlord shall be deemed as an election to terminate this Lease unless a written notice of such intention is given by Landlord to Tenant at the time of reentry; but, notwithstanding any such reentry or reletting without termination, Landlord may at any time thereafter elect to terminate for such previous default. In the event of an elected termination by Landlord, whether before or after reentry, Landlord may recover from Tenant damages, including the costs of recovering the Premises, and Tenant shall remain liable to Landlord for the total Annual Rental (which may at Landlord's election be accelerated to be due and payable in full as of the Event of Default and recoverable as damages in a lump sum) as would have been payable by Tenant hereunder for the remainder of the term less the rentals actually received from any reletting or, at Landlord's election, less the reasonable rental value of the Premises for the remainder of the term. In determining the Annual Rental which would be payable by Tenant subsequent to default, the Annual Rental for the unexpired portion of the term shall be equal (on a monthly basis) to the Annual Rental payable by Tenant immediately prior to the default. If any rent owing under this Lease is collected by or through an attorney, Tenant agrees to pay Landlord's reasonable attorneys' fees to the extent allowed by applicable law.

21.    SUBORDINATION.  This Lease is subject and subordinate to any and all mortgages or deeds of trust now or hereafter placed on the property of which the Premises are a part, and this clause shall be self-operative without any further instrument necessary to effect such subordination; however, if requested by Landlord, Tenant shall within 10 days after such request execute and deliver to Landlord any such certificate(s) as Landlord may reasonably request evidencing subordination of this Lease to or the assignment of this Lease as additional security for such mortgages or deeds of trust. Tenant shall continue its obligations under this Lease in full force and effect notwithstanding any such default proceedings under a mortgage or deed of trust and shall attorn to the mortgagee, trustee or beneficiary of such mortgage or deed of trust, and their successors or assigns, and to the transferee under any foreclosure or default proceedings. Tenant will, upon request by Landlord, execute and deliver to Landlord or to any other person designated by Landlord, any instrument or instruments required to give effect to the provisions of this Section 21.

22.    ASSIGNING AND SUBLETTING.  Tenant shall not assign, sublet, mortgage, pledge or encumber this Lease, the Premises, or any interest in the whole or in any portion thereof, directly or indirectly, without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. If Tenant desires to enter into any assignment of this Lease or a sublease of all or any part of the Premises, Tenant shall first give Landlord written notice of the proposed assignment or sublease, which notice will contain the name and address of the proposed transferee, the proposed use of the Premises, statements reflecting the proposed transferee's current financial condition and income and expenses for the past 2 years, and the principal terms of the proposed assignment or sublease. Landlord may reasonably withhold its consent to a sublease if (a) the rent which the proposed transferee will be required to pay will be equal to less than 90% of the then-current market rent for the portion of the Premises being sublet or (b) the proposed subtenant is an existing tenant or active prospective tenant of Landlord at the Building or Business Park.

If Tenant makes any such assignment, sublease, mortgage, pledge or encumbrance with Landlord's written consent, Tenant shall remain primarily liable for the performance of all terms of this Lease and one-half (1/2) of any rental or any fees or charges received by Tenant in excess of the Annual Rental payable to Landlord hereunder shall be also paid to Landlord as further rental under this Lease. Landlord's consent to one assignment or sublease will not waive the requirement of its consent to any subsequent assignment or

10

sublease as required herein. Tenant shall pay Landlord's costs and attorney fees for review of the assignment or subletting documentation, not to exceed $1,000.00 per assignment or sublet.

23.     TRANSFER OF LANDLORD'S INTEREST.  If Landlord shall sell, assign or transfer all or any part of its interest in the Premises or in this Lease to a successor in interest, then Landlord shall thereupon be released or discharged from all covenants and obligations hereunder, and Tenant shall look solely to such successor in interest for performance of all of Landlord's obligations.  Tenant's obligations under this Lease shall in no manner be affected by Landlord's sale, assignment, or transfer of all or any part of such interest(s) of Landlord, and Tenant shall thereafter attorn and look solely to such successor in interest as the Landlord hereunder.

24.     COVENANT OF QUIET ENJOYMENT.  Landlord represents that it has full right and authority to lease the Premises and, subject to the terms of this Lease, Tenant shall peacefully and quietly hold and enjoy the Premises for the full term hereof without disturbance from Landlord so long as Tenant does not default in the performance of any of the terms hereof.

25.     ESTOPPEL CERTIFICATES.  Within ten (10) days after a request by Landlord, Tenant shall deliver a written estoppel certificate, in form supplied by or acceptable to Landlord, certifying any facts that are then true with respect to this Lease, including without limitation that this Lease is in full force and effect, that no default exists on the part of Landlord or Tenant, that Tenant is in possession of the Premises, that Tenant has commenced the payment of rent, and that Tenant claims no defenses or offsets with respect to payment of rentals under this Lease.

26.     PROTECTION AGAINST LIENS.  Tenant shall do all things necessary to prevent the filing of any mechanics', materialmen's or other types of liens whatsoever, against all or any part of the Premises by reason of any claims made by, against, through or under Tenant.  If any such lien is filed against the Premises, Tenant shall either cause the same to be discharged of record within twenty (20) days after filing or, if Tenant in its discretion and in good faith determines that such lien should be contested, it shall furnish such security as may be necessary to prevent any foreclosure proceedings against the Premises during the pendency of such contest.  If Tenant shall fail to discharge such lien within said time period or fail to furnish such security, then Landlord may at its election, in addition to any other right or remedy available to it, discharge the lien by paying the amount claimed to be due or by procuring the discharge by giving security or in such other manner as may be allowed by law.  If Landlord acts to discharge or secure the lien then Tenant shall immediately reimburse Landlord for all sums paid and all costs and expenses (including reasonable attorneys' fees) incurred by Landlord involving such lien together with interest on the total expenses and costs at the maximum lawful rate.  It is specifically agreed to by the parties that Tenant is not acting as an agent for Landlord and that Landlord shall not be liable for the contracts or liabilities of Tenant.

27.     MEMORANDUM OF LEASE.  If requested by Tenant, Landlord shall execute and record with the Mecklenburg County Register of Deeds a recordable Memorandum or Short Form Lease, specifying the exact term of this Lease and such other terms as the parties shall mutually determine.

28.     FORCE MAJEURE.  In the event Landlord shall be delayed, hindered or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor or materials, strikes, fire, or any other reasons beyond its reasonable control, the performance of such act shall be excused for the period of delay, and the period for performance of any such act shall be extended as necessary to complete performance after the delay period.

29.     REMEDIES CUMULATIVE -- NONWAIVER.  Unless otherwise specified in this Lease, no remedy of Landlord or Tenant shall be considered exclusive of any other remedy, but each shall be

11

distinct, separate and cumulative with other available remedies. Each remedy available under this Lease or at law or in equity may be exercised by Landlord or Tenant from time to time as often as the need may arise. No course of dealing between Landlord and Tenant or any delay or omission of Landlord or Tenant in exercising any right arising from the other party's default shall impair such right or be construed to be a waiver of a default.

      30.    HOLDING OVER. If Tenant remains in possession of the Premises or any part thereof after the expiration of the term of this Lease, whether with or without Landlord's acquiescence, Tenant shall be deemed only a tenant at will and there shall be no renewal of this Lease without a written agreement signed by both parties specifying such renewal. The "monthly" rental payable by Tenant during any such tenancy at will period shall be one hundred fifty percent (150%) of the monthly installments of Annual Rental payable during the final year immediately preceding such expiration. Tenant shall also remain liable for any and all damages, direct and consequential, suffered by Landlord as a result of any holdover without Landlord's unequivocal written acquiescence.

      31.    NOTICES. Any notice allowed or required by this Lease shall be deemed to have been sufficiently served if the same shall be in writing and placed in the United States mail, via certified mail or registered mail, return receipt requested, with proper postage prepaid and addressed as follows:

<div style="margin-left:2em">

AS TO LANDLORD:      c/o Trinity Partners, LLC
440 South Church Street, Suite 800
Charlotte, North Carolina  28202
Attention:  Greg Schild

AS TO TENANT:      The Premises

</div>

      The addresses of Landlord and Tenant and the party, if any, to whose attention a notice or copy of same shall be directed may be changed or added from time to time by either party giving notice to the other in the prescribed manner.

      32.    LEASING COMMISSION. Landlord and Tenant represent and warrant each to the other that they have not dealt with any broker(s) or any other person claiming any entitlement to any commission in connection with this transaction except Trinity Partners, LLC ("**Landlord's Broker**") and Whiteside Industrial Properties, Inc. ("**Tenant's Broker**"; collectively with Landlord's Broker, the "**Broker**"). Landlord and Tenant agree to indemnify and save each other harmless from and against any and all claims, suits, liabilities, costs, judgments and expenses, including reasonable attorneys' fees, for any leasing commissions or other commissions, fees, charges or payments resulting from or arising out of their respective actions in connection with this Lease except as to Broker. Landlord agrees to be responsible for the leasing commission due Broker pursuant to a separate written agreement between Landlord and Broker, and to hold Tenant harmless respecting same.

      33.    MISCELLANEOUS.

      (a)    Rules and Regulations. Landlord shall have the right from time to time to prescribe rules and regulations (the "**Rules and Regulations**") for Tenant's use of the Premises and the Building. A copy of Landlord's current Rules and Regulations respecting the Premises and the Building is attached hereto as Exhibit "D". Tenant shall abide by and actively enforce on all its employees, agents, invitees and licensees such regulations including without limitation rules governing parking of vehicles in designated portions of the Building.

Active 22621924v4 999900.945229

(b)     Evidence of Authority.  If requested by Landlord, Tenant shall furnish appropriate legal documentation evidencing the valid existence and good standing of Tenant and the authority of any parties signing this Lease to act for Tenant.

(c)     Limitation of Landlord's Liability.  If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied solely out of the proceeds of sale received upon execution of such judgment levied thereon against the right, title and interest of Landlord in the Building as the same may then be encumbered; and neither Landlord nor, if Landlord be a partnership, any of the partners comprising Landlord shall have any personal liability for any deficiency. It is understood and agreed that in no event shall Tenant or any person claiming by or through Tenant have the right to levy execution against any property of Landlord other than its interest in the Building as hereinbefore expressly provided.

(d)     Nature and Extent of Agreement.  This Lease, together with all exhibits hereto, contains the complete agreement of the parties concerning the subject matter, and there are no oral or written understandings, representations, or agreements pertaining thereto which have not been incorporated herein. This Lease creates only the relationship of landlord and tenant between the parties, and nothing herein shall impose upon either party any powers, obligations or restrictions not expressed herein.  This Lease shall be construed and governed by the laws of the state in which the Premises are located.

(e)     Binding Effect.  This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors and assigns. This Lease shall not be binding on Landlord until executed by an authorized representative of Landlord and delivered to Tenant.  No amendment or modification to this Lease shall be binding upon Landlord unless same is in writing and executed by an authorized representative of Landlord.

(f)     Captions and Headings.  The captions and headings in this Lease are for convenience and reference only, and they shall in no way be held to explain, modify, or construe the meaning of the terms of this Lease.

(g)     Security Deposit.

(i)     Initial Deposit. Tenant shall pay to Landlord, within fifteen (15) days following the Lease Date, the sum of $47,360.00 (the "**Initial Deposit**") as security for Tenant's performance of all obligations hereunder.  Landlord's obligations and Tenant's rights under this Lease (but not Landlord's rights nor Tenant's obligations under this Lease) are subject to Landlord's timely receipt of the Deposit. The Deposit may be held by Landlord in such manner as it shall elect and Landlord shall be entitled to any interest which accrues on the Deposit.  In the event of a default by Tenant, Landlord may, at its option, apply all or any part of the Deposit to cure the default, and thereupon Tenant shall immediately redeposit with Landlord the amount so applied in order that Landlord will always have the full Deposit on hand during the term of this Lease.  Upon the termination of this Lease, provided that Tenant is not in default hereunder, Landlord shall refund to Tenant any of the remaining balance of the Deposit subject to final adjustments for payment of any rental required by this Lease. If the Premises is sold, Landlord shall have the right to transfer the Deposit to the new owner, and upon the new owner's express assumption of the obligations for the Deposit required by this Lease, Landlord shall thereupon be released from all liability for such Deposit, and Tenant thereafter shall look only to the new owner for such Deposit. The terms hereof shall apply to every transfer of the Deposit.

13

(ii)    Additional Deposit. On or before February 29, 2016, Tenant shall deliver to Landlord an "**Additional Deposit**" of either (i) $50,000.00 in cash or (ii) a Letter of Credit (as defined below) in the initial amount of $50,000.00. As used in this Lease, the term "**Deposit**" means the Initial Deposit, together with the Additional Deposit.

(iii)    Letter of Credit.

(A)    Initial Letter of Credit. In the event that Tenant provides the Additional Deposit in the form of a Letter of Credit as set forth above, Tenant shall timely deliver to Landlord an irrevocable, unconditional, transferable, stand-by letter of credit issued in favor of Landlord, as beneficiary, and issued for Tenant, as account party (the "**Letter of Credit**"), in the amount of $50,000.00 (the "**Letter of Credit Amount**"). All costs and fees incurred in connection with the issuance of the Letter of Credit shall be borne entirely by Tenant. The Letter of Credit shall be issued by a federally chartered bank reasonably approved by Landlord, shall be in form and content reasonably satisfactory to Landlord, shall permit partial draws, shall permit draws upon presentation to a bank office located in Charlotte, North Carolina, and shall have an expiration date (the "**Letter of Credit Expiration Date**") that is no earlier than the day immediately preceding the first (1ˢᵗ) anniversary of the date on which Tenant originally delivered the Additional Deposit. Additionally, if the issuing bank receives a security interest in any property of Tenant to provide security for the issuance of the Letter of Credit (which may consist of or include a security interest previously granted by Tenant to the issuing bank to secure other obligations of Tenant to the issuing bank, in addition to the obligations of Tenant to the issuing bank in connection with the issuance of the Letter of Credit), Tenant shall (i) cause the issuing bank to take such action(s) as may be required to legally perfect its security interest not later than the issuance of the Letter of Credit and (ii) deliver to Landlord, simultaneously with the delivery of the Letter of Credit to Landlord, evidence and documentation reasonably satisfactory to Landlord confirming that such security interest has been legally perfected in favor of the issuing bank (as set forth in the foregoing clause (i)). If the issuing bank does not receive a security interest in any property of Tenant to provide security for the issuance of the Letter of Credit as set forth in the immediately preceding sentence, then simultaneously with the delivery of the Letter of Credit to Landlord, Tenant shall deliver to Landlord a certification to that effect. The information and documentation referred to in the two immediately preceding sentences is herein referred to as the "**Letter of Credit Accompanying Documentation**" and shall be deemed, for purposes of this Section 33(g), to be an integral part of the delivery of the Letter of Credit by Tenant to Landlord.

(B)    Continuation Letters of Credit. In the event that Tenant provides the Additional Deposit in the form of a Letter of Credit as set forth above, Tenant shall, in accordance with the terms of this Section 33(g), continue to provide security for the performance of its obligations under this Lease by providing Landlord with additional irrevocable, unconditional, transferable, stand-by letters of credit in the Letter of Credit Amount issued in favor of Landlord, as beneficiary, and issued for Tenant, as account party (collectively, the "**Continuation Letters of Credit**"; each, a "**Continuation Letter of Credit**") during the entire Lease Term. Each of the Continuation Letters of Credit shall be subject to the same terms and conditions applicable to the Letter of Credit as provided in Section 33(g) herein and shall be accompanied by the applicable Letter of Credit Accompanying Documentation. The original of the first Continuation Letter of Credit (and the applicable Letter of Credit Accompanying Documentation) shall be issued and delivered to Landlord no later than the date that is thirty (30) days prior to the expiration date of the original Letter of Credit (but shall not be effective until such expiration date). The original of each subsequent Continuation Letter of Credit (and the applicable Letter of Credit Accompanying Documentation) shall be delivered to Landlord no later than the date that is thirty (30) days prior to the expiration date of the preceding Continuation Letter of Credit and each Continuation Letter of Credit shall have an expiration date that is no earlier than the day immediately preceding the first (1ˢᵗ) anniversary of the expiration date of the



14

preceding Continuation Letter of Credit (but shall not be effective until the expiration date of the preceding Continuation Letter of Credit).

(C) Draws. If Tenant fails to timely deliver either the Letter of Credit or any Continuation Letter of Credit (including the applicable Letter of Credit Accompanying Documentation) to Landlord in accordance with the provisions of this Section 33(g), then Tenant shall be deemed to be in default under this Lease, the notice and cure periods afforded to Tenant pursuant to this Lease shall not be applicable and such failure by Tenant shall entitle Landlord to immediately draw upon the full outstanding amount of the Letter of Credit and/or the then-applicable Continuation Letter of Credit (as the case may be). Additionally, Landlord shall be entitled to draw upon the Letter of Credit and/or any Continuation Letter of Credit (as the case may be) to fund the performance of any obligation(s) of Tenant under this Lease if Tenant is in default in the performance of such obligation(s) beyond the expiration of any applicable notice and cure period (if any) set forth in the Lease. The issuing bank shall be required (up to the face amount(s) of the Letter of Credit and/or any applicable Continuation Letter of Credit) to disburse amounts to Landlord under the Letter of Credit and/or the applicable Continuation Letter of Credit (as the case may be) based solely on the written statement of Landlord (i) certifying that Tenant is in default in the performance of its obligation(s) under this Lease beyond the expiration of any applicable notice and cure period (if any) set forth in this Lease and (ii) certifying the amount due to Landlord as a result of such uncured default(s) (which shall be the amount payable, up to an aggregate ceiling amount equal to the face amount(s) of the Letter of Credit and/or any applicable Continuation Letter of Credit (as the case may be), to Landlord under such instrument). Landlord agrees to promptly provide Tenant with a copy of any such written statement Landlord provides to the issuing bank pursuant to the immediately preceding sentence.

(D) Transfers. If Landlord's interest in the Premises is sold or otherwise transferred, Landlord shall have the right to transfer the Letter of Credit and any of the Continuation Letters of Credit to the new owner (and such instruments shall each expressly permit such transfers), and Landlord shall thereupon be released from all liability for the safekeeping and administration of the Letter of Credit and the Continuation Letters of Credit and Tenant shall thereafter look solely to such new owner for the safekeeping and administration of the Letter of Credit and the Continuation Letters of Credit. The terms hereof shall apply to every transfer of the Letter of Credit and/or the Continuation Letters of Credit.

(h) Intentionally Deleted.

(i) Lease Review. The submission of this Lease to Tenant for review does not constitute a reservation of or option for the Premises, and this Lease shall become effective as a contract only upon execution and delivery by Landlord and Tenant.

34. SEVERABILITY. If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law notwithstanding the invalidity of any other term or provision hereof.

35. SPECIAL STIPULATIONS. (Special stipulations shall control if in conflict with any of the foregoing provisions of this Lease.) See Exhibit "E" attached hereto and made a part hereof by this reference.

15

IN WITNESS WHEREOF, the parties have caused this Lease to be duly executed pursuant to authority duly given as of the day and year first above written.

"LANDLORD"

SHOPTON RIDGE B, LLC,
a Delaware limited liability company

By:    Shopton Ridge Investors, LLC,
       a Delaware limited liability company,
       Its Member-Manager

By:    TCA Shopton Ridge, LLC,
       a North Carolina limited liability company,
       its Administrative Member

By:    Trinity Capital Advisors, LLC,
       a North Carolina limited liability company,
       its Manager

By:
Name:   GARY K. CHESSON
Title:   MEMBER
Date:   8/7/14

"TENANT"

PINPOINT WAREHOUSING, INC.,
a North Carolina corporation

By:
Name:   Harvey L. Gantt
Title:   President or C.E.O.
Date:   7/30/2014

16

## EXHIBIT "A"

### LEGAL DESCRIPTION OF BUILDING SITE

Being a parcel or tract of land located in the City of Charlotte, Mecklenburg County, North Carolina, and being more particularly described as follows:

Being all of that land consisting of Lot 4 [18B], as shown on that plat entitled "Shopton Ridge Business Park, Phase 1, Map 2" recorded in Map Book 42, Page 915 of the Mecklenburg County Public Registry and situated, lying and being in Steele Creek Township, Mecklenburg County, North Carolina.

TOGETHER WITH the easements, rights and benefits conferred by Declaration of Easements recorded in Book 19017 at Page 103, in the Office of the Register of Deeds for Mecklenburg County, North Carolina.

TOGETHER WITH any interests in real estate contained or conveyed in Declaration of Covenants, Conditions and Restrictions for Shopton Ridge recorded in Book 17559 at Page 851, in the Office of the Register of Deeds for Mecklenburg County, North Carolina.

TOGETHER WITH the easements, rights and benefits conferred by Cross Parking and Access Agreement recorded in Book 26567 at Page 479, in the Office of the Register of Deeds for Mecklenburg County, North Carolina.

A-1

EXHIBIT "B"



B-1

## EXHIBIT "C"

### UPFIT OF PREMISES

**1.    LANDLORD'S WORK**

Landlord, at Landlord's sole cost and expense, shall construct the following improvements to the Premises (the "**Landlord's Work**"):

- Strip and wax all existing VCT floor tile in break room/cafeterias and restroom areas
- Replace light bulbs and ballasts in office and warehouse areas as needed
- Replace damaged ceiling tiles in office areas as needed
- Clean light lenses and HVAC return grilles in office areas as needed
- Clean all office windows and storefront glass (inside and out)
- Clean and sanitize restrooms and break room/cafeteria areas
- Ensure that all existing mechanical, plumbing and electrical systems, and all dock doors, are in good working order on the date on which Landlord first delivers the Premises to Tenant.

**2.    TENANT ALLOWANCE**

Subject to the terms set forth herein, Landlord shall pay to Tenant an allowance of up to Forty Thousand and 00/100 Dollars ($40,000.00) (the "**Allowance**") for the purpose of reimbursing Tenant for the direct out-of-pocket "hard costs" incurred by Tenant in constructing and completing any desired physical improvements in the Premises (the "**Tenant's Work**"), including, without limitation, the installation of new landscaping planters at the entrance of the Building; provided, however, that if the actual cost of Tenant's Work is less than Forty Thousand and 00/100 Dollars ($40,000.00), Landlord shall only reimburse Tenant for the actual cost of such Tenant's Work. For avoidance of doubt, the performance of any Tenant's Work shall be subject to the terms and conditions of the Lease, including, without limitation, Section 5.

Notwithstanding any of the foregoing to the contrary, and provided Tenant is not then in default of this Lease beyond any applicable notice and cure period, Landlord shall reimburse Tenant the Allowance only after the following events have taken place:

(i)     Approval by Landlord of the completed Tenant's Work, said approval not to be unreasonably withheld, delayed or conditioned.

(ii)    Receipt by Landlord of a certification by Tenant's contractor, and verified by Landlord's architect, certifying that Tenant's Work has been completed in accordance with the plans and specifications approved by Landlord for such Tenant's Work.

(iii)   Receipt by Landlord from Tenant of a release of lien in form and substance reasonably satisfactory to Landlord holding Landlord harmless from any and all obligations whatsoever which may have been incurred by Tenant, Tenant's contractor, subcontractor, materialmen and any others providing labor and/or materials in connection with Tenant's Work.

(iv)    Receipt by Landlord from Tenant of copies of paid invoices establishing the actual costs paid by Tenant for the construction and/or completion of Tenant's Work.

If the total actual cost of the Tenant's Work exceeds the Allowance, Tenant shall be solely responsible for such amounts in excess of the Allowance. If the total actual cost of the Tenant's Work is less than the Allowance, Landlord shall be entitled to retain any such excess. If Tenant has not requested and earned all or any portion of the Allowance on or before December 31, 2014, Landlord's obligation to provide any remaining Allowance to Tenant shall be null and void.

C-1

EXHIBIT "D"

RULES AND REGULATIONS

1.    **Restricted Uses.**  Neither the Premises nor any part of the common areas of the Building or the Business Park shall be used by Tenant for any one or more of the following uses:

(a)    Agriculture or any related use, including any roadside stand for the display and sale of agricultural products and any use which involves the raising, breeding, or keeping of any animals or poultry;

(b)    Processing or slaughter of livestock, swine, poultry or other animals;

(c)    Manufacture of leather goods;

(d)    Manufacture of explosives or explosive agents;

(e)    Manufacture, sale, rental, repair or storage of heavy equipment, buses, trucks, trailers, automobiles, recreational vehicles and mobile or trailer homes;

(f)    Unscreened outdoor storage, outdoor fabrication or outdoor handling of any machinery, parts, material, supplies or products;

(g)    Residential uses;

(h)    Overnight parking of campers, mobile homes, boats, trailers or motor homes;

(i)    Erecting and maintaining structures of a temporary nature, except that during the period of construction of improvements to the Premises, Tenant's contractors or subcontractors may be permitted to erect or maintain such temporary structures upon Landlord's prior written approval;

(j)    Jails, prisons, labor camps, penal, detention or correction facilities or farms;

(k)    Cemeteries or mausoleums;

(l)    Mining, including the extraction, processing and removal of sand, gravel, stone, minerals or clay;

(m)    Any land fills, any hazardous waste disposal or storage facilities and any incinerators;

(n)    Racetracks, raceways and drag strips; and

(o)    Massage parlors, topless night clubs or similar business operations.

(p)    Fast food restaurants;

(q)    Airports, heliports or helistops, bus or train terminals;

(r)    Hotels or motels;

D-1

(s)    Rest stops, rest stations or service stations;

(t)    Flea markets;

(u)    Stadiums;

(v)    Adult care centers;

(x)    Cinemas or movie theaters;

(y)    Night Clubs or bars; and

(z)    Amusement parks, amusement galleries, arcades or turkey shoots.

2.    **Nuisances.** Tenant shall not cause any unclean, unhealthy, unsightly or unkempt condition to exist in the Premises or in the common areas of the Building or the Business Park. Tenant shall not use the Premises or any portion of the common areas of the Building or the Business Park, in whole or in part, for the deposit, storage or burial of any property or thing that will cause the above-mentioned areas to appear to be in an unclean or untidy condition or that will be obnoxious to the eye; nor shall Tenant allow any substance, thing, or material to be kept, utilized or carried out in the Premises or the common areas of the Building or the Business Park that will emit foul or obnoxious odors, fumes, smoke or dust or that will cause any vibration or noise or other condition that will or might disturb the peace, quiet, safety, comfort, or serenity of the occupants of the Building or the Business Park. No noxious, offensive or illegal trade or activity shall be carried out in the Premises or in the common areas of the Building or the Business Park, nor shall anything be done tending to cause embarrassment, discomfort, annoyance, or nuisance to any person using any portion of the Building or the Business Park.

3.    **Restricted Actions on Common Areas of the Building and the Business Park.** Tenant shall not cause or allow any cutting of vegetation, dumping, digging, filling, destruction or other waste to be committed on the common areas of the Building or the Business Park. Tenant shall not cause any obstruction of, or allow or cause anything to be kept or stored on, altered, constructed or planted in, or removed from the common areas of the Building or the Business Park, without Landlord's prior written consent.

4.    **Sign Display.** All signage will be coordinated by Landlord throughout the Business Park for uniformity and attractiveness. The size, shape, design, lighting, materials and location of all signs shall conform to the uniform signage plan for the Business Park. Tenant shall not cause any sign, tag, label, picture, advertisement or notice to be displayed, distributed, inscribed, painted or affixed by Tenant on any part of the Building, the Business Park or the Premises without the prior written consent of Landlord. Landlord shall have the right, at Tenant's sole cost and expense, to remove all unapproved signs installed by or on behalf of Tenant, without notice to Tenant.

5.    **Drives and Parking Areas.** All parking shall be within marked parking spaces. There shall be no on-street parking and at no time shall Tenant obstruct drives and loading areas intended for the joint use of all tenants of the Building. The drives and parking areas in the Business Park are for the joint use of all tenants of the Business Park unless specifically marked. Truck traffic and parking will be restricted to areas designated by Landlord. Tenant, its employees, agents and invitees shall comply with reasonable parking rules and regulations as they may be posed and distributed from time to time. Tenant is responsible for controlling all of its truck traffic in accordance with the restrictions

D-2

and regulations imposed by Landlord. During the Lease term, and subject to the foregoing terms and conditions, Tenant shall have the right to use up to 2.5 parking spaces in the surface lot in front of the Building per 1,000 square feet of the Premises (*i.e.*, 256 parking spaces based on the current size of the Premises), at no charge to Tenant.

6.  **Storage and Trash Disposal.** No materials, supplies or equipment belonging to Tenant shall be stored in any area of the Building or the Business Park, except inside the Premises. Trash disposal is confined to the receptacles provided by Tenant in a location approved by Landlord and no trash receptacles may be placed in any other location in the Premises, in the Building or in the Business Park

7.  **Locks.** No additional locks shall be placed on the doors of the Premises by Tenant. Landlord will, without charge, furnish Tenant with two keys for each lock existing upon the entrance door when Tenant assumes possession of the Premises, with the understanding that, at the termination of the Lease, the keys shall be returned.

8.  **Improvements, Contractors and Service Maintenance.** Tenant shall not make any improvements to the exterior of the Building or the Business Park and Tenant shall not make any structural changes or other material alterations, additions or improvements to the Premises without the prior written consent of Landlord. Tenant will refer all of Tenant's contractors, contractors' representatives and installation technicians rendering any service on or to the Premises to Landlord for Landlord's approval and supervision before performance of any service. This provision shall apply to all work performed in the Premises, including installation of electrical devices and attachments and installations of any nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment or any other physical portion of the Premises, the Building or the Business Park.

9.  **Regulations for Operation and Use.** Tenant shall not place, install or operate in the Premises or in any part of the Building or the Business Park any engine, stove or machinery, nor shall Tenant conduct any mechanical or cooking operations therein, nor place or use in or about the Premises or any part of the Building or the Business Park any explosives, gasoline, kerosene, oil, acids, caustics or any other flammable, explosive or hazardous material, without the prior written consent of Landlord.

10. **Window Coverings.** Windows facing the Building exterior shall at all times be wholly clear and uncovered (except for such blinds or curtains or other window coverings as Landlord may provide or approve) so that a full unobstructed view of the interior of the Premises may be had from the exterior of the Building.

11. **No Violations of Fire Laws or Health Code.** Tenant shall not do or permit anything to be done in the Premises, or bring or keep anything therein, which will obstruct or interfere with the rights of other tenants in the Building or the Business Park or in any other way injure or annoy them or conflict with any laws relating to fires, or with any regulations of the Fire Department or with any insurance policy upon the Building or the Business Park, or any part thereof, or conflict with any of the rules and ordinances of the Board of Health.

12. **No Violations of Laws.** Tenant shall promptly and at its expense execute and comply with all laws, rules, orders, ordinances, including all applicable zoning ordinances, and regulations of the City, County, State or Federal Government, and of any department or bureau of any of them and of any other governmental authority having jurisdiction over the Premises, affecting Tenant's occupancy of the Premises or Tenant's business conducted therein.

D-3

13. **No Use of Roof.** Neither Tenant, nor Tenant's servants, employees or agents shall go upon the roof of the Building without the written consent of Landlord.

14. **No Canvassing.** Canvassing, soliciting and peddling in and about the Building and the Business Park is prohibited.

15. **No Loud Musical Devices.** Tenant shall not operate or permit to be operated any musical or sound producing instrument or device inside or outside the Premises which may be heard outside the Premises or by other tenants in the Building or the Business Park.

16. **Use of Washrooms.** Tenant shall not use the washrooms, restrooms, and plumbing fixtures of the Premises or the Building, and appurtenances thereto, for any purposes other than the purposes for which they were constructed, and Tenant shall not deposit any sweepings, rubbish, rags, or other improper substances therein. If Tenant or Tenant's servants, employees, agents, contractors, jobbers, licensees, invitees, guests or visitors cause any damage to such washrooms, restrooms, plumbing fixtures or appurtenances, such damage shall be repaired, at Tenant's expense, and Landlord shall not be responsible therefor.

17. **No Unpleasant Odors.** Tenant shall not cause or permit any unpleasant odors to emanate from the Premises, or otherwise interfere, injure or annoy in any way other tenants in the Building or the Business Park, or persons conducting business with them.

18. **Disposal of Crates.** When conditions are such that Tenant must dispose of crates, boxes, etc. on the sidewalk or parking areas on the Land, it will be the responsibility of Tenant to dispose of same only between the hours of 5:45 p.m. until 7:15 a.m.

19. **No Food Distribution.** No prepared food and/or beverages shall be distributed from the Premises, but, notwithstanding the provisions of Section 9 hereof or this Section 19, Tenant may prepare coffee and similar beverages and warm typical luncheon items for the consumption of Tenant's employees and invitees. This section does not prohibit food package assembly and packaging assembly that may be conducted by Tenant (to the extent permitted by the terms of the Lease and to the extent permitted by applicable laws) such as the assembly of packaged cookie mixes or bread mixes into individualized packaging materials, which uses shall in any event be permitted only in the event that Tenant occupies the entire Building.

20. **Location of Improvements.** Tenant will not locate furnishings or cabinets adjacent to mechanical or electrical access panels or over air conditioning outlets in the Premises so as to prevent operating personnel from servicing such units as routine or emergency access may require. Tenant shall be responsible for any cost associated with moving such furnishings for Landlord's access to such mechanical or electrical access panels or air conditioning outlets.

21. **Modifications.** Landlord shall have the right from time to time to make any and all such reasonable modifications and additions to these Rules and Regulations as may be necessary for the safety, care, quiet enjoyment and cleanliness of the Building and the Business Park. Tenant agrees to abide by these Rules and Regulations and any reasonable modifications and additions as are hereafter adopted by Landlord, including, but not limited to, modifications made by Landlord as a result of any changes in the city zoning ordinance.

D-4

EXHIBIT "E"

SPECIAL PROVISIONS

1.      Provided Tenant is not then in default in the performance of any term or condition of this Lease, Tenant shall have the option to renew this Lease for one (1) five (5) year period commencing on November 1, 2021 (the "**Renewal Period**"). The Renewal Period shall be exercisable by Tenant giving written notice to Landlord in accordance with this Lease of its intention to exercise the Renewal Period on or before November 1, 2020. In the event Tenant shall exercise the Renewal Period, the terms and conditions of this Lease shall be applicable to the Renewal Period; provided, however, the Minimum Rental payable during the Renewal Period shall be as follows:

| Period | Monthly Amount |
|--------|----------------|
| 11/1/21 – 10/31/22 | $57,823.72 |
| 11/1/22 – 10/31/23 | $59,558.44 |
| 11/1/23 – 10/31/24 | $61,345.19 |
| 11/1/24 – 10/31/25 | $63,185.54 |
| 11/1/25 – 10/31/26 | $65,081.11 |

There shall be no option to renew this Lease except as set forth in this _Section 1_.

E-1



**BANK** *of* **NORTH CAROLINA**

IRREVOCABLE LETTER OF CREDIT

Date: February 26, 2016

      To:   AKF2 Shopton Holdings LLC
              1400 NW 107th Ave. 5th Floor
              Miami, FL 33172

      To Whom It May Concern:

At the request of <u>Pinpoint Warehousing Inc.</u> we hereby authorize you to draw on us from time to time up to an aggregate amount of <u>$50,000.00</u> by your sight draft presented to us.

All drafts under the Letter of Credit must be accompanied by a signed statement by an authorized officer of <u>AKF2 Shopton Holdings LLC</u> stating that:

Pinpoint Warehousing Inc. has failed to comply with the terms of the Lease Agreement dated August 7, 2014."

And must bear the clause "Drawn under Bank of North Carolina Letter of Credit" number <u>100438229</u> dated February 26, 2016.

In no event will the Letter of Credit be terminated prior to <u>February 28 2017</u>. The Bank hereby agrees that all drafts drawn and negotiated in compliance with the terms hereof will duly honored upon presentation and delivery of the documents specified above during the term of this Letter of Credit or within 15 days from the effective date of its expiration.

Except so far as otherwise expressly stated, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1983 revision), International chamber of Commerce publication No 400".

Bank of North Carolina

By: *Ray Singleton Jr.*
Ray Singleton,
Vice President

**EXHIBIT B**

*Deferral Agreement*

## RENTAL DEFERRAL AGREEMENT

This Rental Deferral Agreement ("RDA") entered into this 22nd day of June, 2017, by and between AKF2 Shopton, LLC ("Landlord") and *Pinpoint Warehousing, Inc.* ("Tenant").

### WITNESSETH

WHEREAS, Landlord's predecessor in interest and Tenant entered into a written lease agreement dated August 7, 2014 (the "Lease"), for space identified as *3915 Shopton Road, Charlotte, NC 28217 consisting of 102,400 of rentable square feet*; and

WHEREAS, Landlord and Tenant, for business reasons, have agreed that for a period of time, a portion of the rent, interest and late fees under the Lease should be deferred to a later period of time within the term of the Lease, subject to certain terms and conditions; and

WHEREAS, The Landlord and Tenant wish to set out their understanding in writing;

NOW THEREFORE, in consideration of the mutual covenants and conditions set out herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties for themselves, their successors and assigns do covenant and agree as follows:

1. The above recitations, including that of consideration are true and correct.
2. Tenant owes delinquent obligations in the sum of $144,366.00 ("Deferred Rent").
3. The Deferred Rent and Monthly Rent shall be paid as follows and must be paid no later the date specified as time is of the essence and any notice or opportunity to cure under the Lease terms is waived and of no effect as it relates to the payments referenced herein:

|            | Monthly Rent | Deferred Rent |
|------------|-------------:|--------------:|
| 6/1/2017   |              |               |
| 6/9/2017   |              | $ 13,823.50   |
| 6/16/2017  |              | $ 13,823.50   |
| 7/1/2017   | $ 61,793.90  | $ 12,500.00   |
| 7/14/2017  |              | $ 12,500.00   |
| 7/28/2017  |              | $ 15,000.00   |
| 8/1/2017   | $ 61,793.90  |               |
| 8/11/2017  |              | $ 15,000.00   |
| 8/25/2017  |              | $ 15,000.00   |
| 9/1/2017   | $ 61,793.90  |               |
| 9/8/2017   |              | $ 15,000.00   |
| 9/22/2017  |              | $ 15,859.50   |
| 10/1/2017  | $ 61,793.90  |               |
| 10/6/2017  |              | $ 15,859.50   |
|            | $ 247,175.60 | $ 144,366.00  |

Together with applicable additional rent.

4. Tenant acknowledges the Deferred Rent is not a forgiveness or reduction of Rent, but is an earned, accrued sum which payment is deferred in accordance with the terms of this RDA.

5. Landlord shall conditionally waive late fees and interest accruing during the rental schedule set out in Paragraph 3 above providing payments are made timely. If any payment is not timely made, all applicable late fees and interest will be fully chargeable as if this RDA has not been executed.

6. All payments due identified in paragraph 3 shall be made by wire, ~~or~~ ACH transfer *OR* ~~pursuant~~ *OVERNIGHT check* to instructions to be provided by Landlord.

7. In the event Tenant is in default of the Lease and/or this RDA, the deferral of the then balance of the Deferred Rent shall cease and the then outstanding sum of Deferred Rent shall again be immediately due and subject to collection. Such right is without prejudice to any other rights or remedies Landlord may have as a result of a default.

8. To the extent not inconsistent with or contrary to this RDA, the terms of the Lease shall remain in full force and effect.

Signed and Sealed on the date first above written.

Witness as to Landlord:

Name: _____

Print Name: CARLOS GARCIA-VELEZ

Name: _Megan Carbee_____

Print Name: Megan Carbee

Witness as to Tenant:

Name: Deborah Ferguson

Print Name: Deborah Ferguson

Name: _____

Print Name: TRAY W. Lee

LANDLORD:

AKF2 Shopton, LLC, a Delaware limited liability company

By: _____

MATTHEW ADLER , Authorized Signatory

TENANT:

Pinpoint Warehousing, Inc., a North Carolina corporation

By: _____

Print Name: Harvey Gantt

Title: President + CEO

**<u>EXHIBIT C</u>**

*Assignment*

## ASSIGNMENT OF LEASES AND SECURITY DEPOSITS

**SHOPTON RIDGE B, LLC**, a Delaware limited liability company ("Assignor") in consideration of the sum of Ten and 00/100 Dollars ($10.00) in hand paid and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby assigns, transfers, sets over and conveys to **AKF2 SHOPTON, LLC**, a Delaware limited liability company (as assignee of Adler Kawa Acquisitions, LLC) ("Assignee"), all of Assignor's right, title and interest in and to the leases described on Exhibit A attached hereto (the "Leases"), and Assignee assumes all of the obligations of Assignor under the Leases. Further, Assignor hereby transfers to Assignee (and Assignee hereby assumes) all right, title and interest in and to that certain Escrow Agreement between Chicago Title Insurance Company ("Escrow Agent"), Shopton Ridge B, LLC and Whiteside Industrial Properties, Inc. ("Broker") dated as of August 27, 2014 (the "Escrow Agreement"), regarding Escrow Agent's holding of $50,000.00 in commissions which are payable to Broker in accordance with the terms of such Escrow Agreement.

This Assignment shall be construed and enforced in accordance with the laws of the State in which the Property is located.

In any action between Assignor and Assignee under this Assignment, the prevailing party shall be entitled to recover from the other party, and the other party shall pay to the prevailing party, the prevailing party's attorneys' fees and disbursements and court costs incurred in such action.

This Assignment may be executed in any number of counterparts, each of which so executed shall be deemed an original; such counterparts shall together constitute but one agreement.

[SEE SIGNATURE PAGES ATTACHED]

25197948v1

IN WITNESS WHEREOF, Assignor and Assignee have executed this agreement this ___**1**___ day of April, 2015, which agreement is effective this date.

ASSIGNOR:

**SHOPTON RIDGE B, LLC,**
a Delaware limited liability company

By:    Shopton Ridge Investors, LLC,
       a Delaware limited liability company,
       its Member-Manager

By:    TCA Shopton Ridge, LLC,
       a North Carolina limited liability company,
       its Administrative Member

By:    Trinity Capital Advisors, LLC,
       a North Carolina limited liability company,
       its Manager

By: _____
Name:  Gary K. Chesson
Title:   Authorized Member


[SEE ADDITIONAL SIGNATURE PAGE ATTACHED]

ASSIGNEE:

**AKF2 SHOPTON, LLC,**
a Delaware limited liability company

By: _____
Name: _____JOHN P. MEYER_____
Title: _____VICE PRESIDENT_____

# SCHEDULE A

SCHEDULE OF LEASES

*3915 Shopton Road (18-B):*
- Pinpoint
    - o Lease (August 7, 2014)

# EXHIBIT D

*Repair and Cleanup Costs Documentation*



# SOUTHERN COMFORT OF CHARLOTTE

POST OFFICE BOX 34034
CHARLOTTE, N.C. 28234
PHONE (704) 423-8870
FAX (704) 423-8873

August 27, 2014

Pinpoint Warehousing, Inc.
3915 Shopton Ridge
Charlotte, NC 28217

Attn: Mr. Zach Gantt

Re: Maintenance Service Inspection

Dear Mr. Gantt:

For your consideration and evaluation we offer the following service maintenance proposal for your heating and air conditioning equipment. A maintenance agreement will entitle you to our *Priority Service* when unforeseen problems occur. You will also be able to take advantage of our *Preferred Customer Discount* on parts and materials.

## FREQUENCY OF INSPECTION
- Quarterly (Winter, Spring, Summer, Fall)

## EQUIPMENT TO BE SERVICED
- 24 Lennox RTUs
- 10 Mitsubishi Ductless Units
- 3 Split Systems
- 8 Small Exhaust Fans
- 3 Large Exhaust Fans
- 1 Heat Recovery Make-up

## WORK TO BE PERFORMED
- Inspect equipment in seasonal mode of operation
- Make minor adjustments when necessary
- Clean or change filters quarterly
- Check condition of belts
- Lubricate equipment as required
- Check drain pan for any debris
- Check airflow through evaporator and condenser coils
- Check fan motors for proper operation
- Check refrigerant circuit

HEATING • VENTILATION • AIR CONDITIONING

Pinpoint Warehousing, Inc.                Page 2                August 27, 2014

Attn: Mr. Gantt

- Check system electrical components for operating condition
- Check condition of compressor

**MATERIALS INCLUDED**
- Pleated Filters, Lubricants and Belts (belts changed annually)

Maintenance agreement price for the above inspection service is *$2,817.00 per inspection*. Any major repairs found to be necessary at the time of inspection will be noted on the inspection report completed by the technician. No repairs will be made without authorization from the customer.

*Note:* If you prefer to use fiberglass filters instead of pleated filters, the inspection cost would be reduced to *$2,518.00 per inspection*. The condenser coils should be cleaned annually. Presently, there is no access to water on the roof. If two or three water access points were installed on the roof, we would add coil cleaning to the contract at a cost of *$550.00 per inspection.*

Our labor rate for emergency service or major repair work is *$70.00 per hour* for work performed during normal working hours of 8:00 AM to 4:30 PM. Work at times other than normal working hours is *$105.00 per hour*. An additional mileage travel charge will be applied to any service work not covered under the maintenance agreement. Any materials and/or parts for repairs would be billed at *10%* off of our list price for any customer under a maintenance agreement.

Our maintenance agreement price and labor rates are guaranteed for one year from the date of acceptance of this service agreement. The price may be adjusted on the renewal anniversary date to reflect prevailing labor and material costs.

This maintenance agreement will automatically renew on the anniversary date. However, either party may terminate this agreement upon thirty days written notice before the anniversary date of the agreement.

Attn: Mr. Gantt

We at Southern Comfort greatly appreciate your time and consideration in making us your choice for heating and air conditioning service and maintenance.

Very truly yours,

SOUTHERN COMFORT
OF CHARLOTTE

Paul M. Martin

APPROVED BY: _____

DATE: _____

| Pinpoint | RTU-1 | Lennox | 13HPD-180-230-0 | 5807B51891 |
|---|---|---|---|---|
| Pinpoint | AHU-1 | Lennox | CB30M-21/2-6-4P | 5807B35281 |
| Pinpoint | RTU-2 | Lennox | LGC120S2BH2G | 5607C00503 |
| Pinpoint | RTU-3 | Lennox | LGC1202BH2G | 5607C00502 |
| Pinpoint | RTU-4 | Lennox | LGC09052BH2G | 5607C00510 |
| Pinpoint | RTU-5 | Lennox | LGC072S2BH1G | 5607C00008 |
| Pinpoint | RTU-6 | Lennox | LG102S2BH2G | 5607C00715 |
| Pinpoint | RTU-7 | Lennox | LGC090S2BH2G | 5607C00509 |
| Pinpoint | RTU-8 | Lennox | LGC102S2BH2G | 5607C00716 |
| Pinpoint | RTU-9 | Lennox | LGA240H2-PKG | S5607C00404 |
| Pinpoint | RTU-10 | Lennox | LGA240H2PKG | S5607C00406 |
| Pinpoint | RTU-11 | Lennox | LGA24H2BM3B | 5607C00415 |
| Pinpoint | AHU-11 | energy recovery syster | 50062 02 X H 33 L4 | 200720 00096 |
| Pinpoint | RTU-12 | Lennox | LGA240H2-PKG | 5607C00410 |
| Pinpoint | RTU-13 | Lennox | LGA240H2BM3B | 5607C00412 |
| Pinpoint | RTU-14 | Lennox | LGA240H2-PKA | 5607C00407 |
| Pinpoint | RTU-15 | Lennox | LGA240H2-PKG | 5607C00408 |
| Pinpoint | RTU-16 | Lennox | LGA240H2-PKG | 5607C00409 |
| Pinpoint | RTU-17 | Lennox | LGA240H2-PKG | 5607C00405 |
| Pinpoint | RTU-18 | Lennox | LGA240H2BMG | 5607C00413 |
| Pinpoint | RTU-19 | Lennox | LGA240H2-PKG | 5607C00414 |
| Pinpoint | RTU-20 | Lennox | LGA240H2BMG | 5607C00411 |
| Pinpoint | RTU-21 | Lennox | LGC300S2-PKG | 5607C00391 |
| Pinpoint | RTU-22 | Lennox | LGC300S2BM2G | 5607C00392 |
| Pinpoint | RTU-23 | Lennox | LGC300S2-PKG | 5607C00393 |
| Pinpoint | RTU-24 | Lennox | LGC300S2BMG | 5607C00390 |
| Pinpoint | RTU-27 | Lennox | LGH300S4BM1G | 5611G05591 |
| Pinpoint | Split-1 | Lennox | TSA060S4N44G | 5811G01741 |
| Pinpoint | AHU-1 | Lennox | CBX26UH-060-230-2 | N/A |
| Pinpoint | Split-2 | Lennox | TSA060S4N44G | 5811G01748 |
| Pinpoint | AHU-2 | Lennox | N/A | N/A |
| Pinpoint | Mini split-1 | Mitsubishi | MU-A12WA | 6004079 |
| Pinpoint | AHU-1 | Mitsubishi | MS-A12WA | 6005849 |
| Pinpoint | Mini split-2 | Mitsubishi | MUY-A24NA | 7009008 |
| Pinpoint | AHU-2 | Mitsubishi | MSY-A24N2 | 7002737 |
| Pinpoint | Mini split-3 | Mitsubishi | MUY-A24NA | 7009019 |
| Pinpoint | AHU-3 | Mitsubishi | MSY-A24NA | 7000509 |
| Pinpoint | Mini split-4 | Mitsubishi | MUY-A12WA | 6003733 |
| Pinpoint | AHU-4 | Mitsubishi | MS-A12WA | 60050862 |
| Pinpoint | Mini split-5 | Mitsubishi | MU-A12WA | 6004080 |
| Pinpoint | AHU-5 | Mitsubishi | MS-A12W | 6005849 |
| Pinpoint | Mini split-6 | Mitsubishi | MUY-A24NA | 6007340 |
| Pinpoint | AHU-6 | Mitsubishi | MSY-A24NA | 6006923 |
| Pinpoint | Mini split-7 | Mitsubishi | MU-A12WA | 6004123 |
| Pinpoint | AHU-7 | Mitsubishi | MS-A12WA | 6006564 |
| Pinpoint | Mini split-8 | Mitsubishi | MUY-A24NA | 6007143 |
| Pinpoint | AHU-8 | Mitsubishi | MUY-A24NA | 6006376 |

| | | | | |
|---|---|---|---|---|
| Pinpoint | Mini split-9 | Mitsubishi | MUY-A24NA | 6007364 |
| Pinpoint | Ahu-9 | Mitsubishi | MSY-P24NA | 6007388 |
| Pinpoint | Mini split-10 | Mitsubishi | MU-A12WA | 6003995 |
| Pinpoint | AHU-10 | Mitsubishi | MS-A12WA | 6006103 |



James Penny
AKF2 Shopton, LLC
7421 Carmel Executive Park Suite 331
Charlotte, NC 28225

RE: 3915 Shopton Road Charlotte, NC 28217

Dear Jim,

This company proposes to provide materials, labor, protection, and insurance for the above-mentioned job.

The scope of work includes:

1. Provide and install 2 coats Building Standard Paint on Exterior Walls.

2. Patch Holes and Repair Sign Mount Hole Locations

3. All work complete weekend after normal business hours.

The price for this is $2,200.00 per Site Visit

Thank you for the opportunity to bid this job. If you have any further questions, please do not hesitate to contact me.


Sincerely,


Aubrey Hart ,
President

**Services Unlimited CPM Inc.**
**619 Pine Forest Road**
**Charlotte, NC 28214**
**Phone: 704-393-2979**

December 14, 2017

Adler Kawa
7421 Carmel Executive Park Drive
Suite 331
Charlotte, NC 28226
Attn: Jim Penny

### PROPOSAL

### 3915 Shopton Road - Pinpoint

**Part 1: Office light repairs**

- Replace 151 T-8 741 bulbs (either out or wrong type bulbs)
  @$10.80 each $1,630.80
- Replace 1 TLFGGLDUV bulb                          $   12.80
- Replace 4 CF Fluorescent bulbs @$11.92 each       $   47.68
- Replace 8 T-8 841 bulbs @$4.75 each               $   38.00
- Labor                                             $  975.00
- Total                                             $2,704.28
- Tax                                               $  196.06
- Total                                             $2,900.34

**Part 2: Office janitorial cleaning and minor repair**

- *Re-glue front strips to front of breakroom cabinet
- Strip, seal and wax VCT 3762 sq. ft.             $1,673.00
- *Clean, sanitize all restrooms and breakrooms (including washing cabinets)

- *Roll up data wires, and place above ceiling
- *Vacuum carpet- offices in warehouse and front office area
- *Remove misc. trash
- *Replace 5 ceiling tiles
- Wash interior office windows
- Labor $ 595.00
- Total $ 2,268.00

Part 3:  Warehouse light repair

- Replace 1 emergency light fixture $ 49.70
- Replace 155 T-5 841 bulbs @12.18each $1,887.90
- Scissor lift $ 175.00
- Labor $ 975.00
- Sub-Total $3,087.60
- Tax $ 223.85
- Total $ 3,311.54

Part 4:  Washing windows, area cleaning and minor repair

- *Roll up or remove 6 data drops
- *Remove  1 air hose drop
- *Remove trash and debris
- *Clean warehouse office windows
- Total $ 275.00

Part 5:  Warehouse floors: (110,000 sq. ft. )

- Remove shipping stickers from warehouse floors and scrape
- Sweep warehouse floor with dust down
- Machine wash warehouse floors with H.D. Biodegradable chemical (at least twice)
- Machine rinse floors with final rinse solution
- Pressure wash around edges of warehouse floors and around dock doors.
- Hand mop around warehouse posts
- Machine, chemicals, and labor $3,432.00

**James please approve and return to Services Unlimited CPM, Inc.
Once we have approval we can get this on schedule.**

**Signature**_____          **Date:** _____

Proposal will remain in effect for thirty (30) days

All material is guaranteed to be as specified.  All work to be completed in a
workmanlike manner according to standard practices.  Any alteration or
deviation from the above specifications involving extra costs will be
executed only upon written orders, and will become an extra charge over and
above the estimate.

James to proceed with this work please sign below and send to us by email
at (sunlimited@carolina.rr.com) or fax at 704-395-2297.

Signature: _____          Date: _____



## ESTIMATE

**Name:** Jim Penny

**Address:** 3915 Shopton Road

**City, State, Zip:** Charlotte, NC.  28217

**Sales Person:** Fred Graves

**Date:** 12/14/17

**Phone:** 704-361-7416

| _DESCRIPTION_ | _AMOUNT_ |
|---|---|
| Door 1 – Bottom Strut | $95.00 |
| Door 2 - Bottom Strut | $95.00 |
| Door 3 – 9'2"X24" Model 224E Bottom Section | $545.00 |
| Door 4 – 9'2"X24" Model 224E Bottom & Intermediate (3&4) Sections, Strut | $1,435.00 |
| Door 5 – 9'2"X24" Model 224E Bottom Section & Intermediate (3&4) Sections, Strut, Springs | $1,885.00 |
| Door 7 - 9'2"X24" Model 224E Intermediate (3&4) Sections | $890.00 |
| Door 9 – 9'2"X24" Model 224E Bottom Section & Intermediate Section, Springs, Lm J3311M Operator | $3,190.00 |
| Door 10 - 9'2"X24" Model 224E Bottom Section & Intermediate Section, Strut | $990.00 |
| Door 11 - 9'2"X24" Model 224E Bottom Section, Springs, Strut | $995.00 |
| Door 12 - 9'2"X24" Model 224E Bottom Section | $545.00 |
| Door 13 - 9'2"X24" Model 224E Bottom & Intermediate Section, Springs, Rollers | $1,635.00 |
| Door 13 - 9'2"X10 Model 224E Sections & hardware | $2,050.00 |
| Door 14 - Springs & Rollers | $645.00 |
| Door 15 - 9'2"X24" Model 224E Bottom & Intermediate Sections | $990.00 |
| Door 16 - Springs | $450.00 |
| 48 Hour Scissor Lift Rental | $800.00 |
| For lube & tune (which includes replacing damaged hinges and missing nuts & bolts  ( $75.00 ea) | $1,200.00 |

$18,363

**INTERIORS GROUP INC. GENERAL CONTRACTORS WORKSHEET**

| | | 10.00% |
| --- | --- | --- |
| | | 5.00% |
| | | 115.50% |

| | |
| --- | --- |
| **Date:** | December 13, 2017 |
| **Client:** | Adler KAWA Real Estate Services |
| **Tenant:** | AKF2 Shopton, LLC |
| **Building:** | 3915 Shopton Road Charlotte, NC 28217 |
| **Estimator:** | Kirk Krone |
| **Scope Of Work:** | 102,400 |

| UPFITTING ALLOWANCES | Takeoff | Supplier Unit Price | Supplier Total Price | Sales Unit Price | Total Sales Price | Price Per Square Foot |
| --- | --- | --- | --- | --- | --- | --- |
| **DEMOLITION & SITEWORK** | | | | | | |
| Remove VCT Flooring Approx 2000 Sqft | | $700.00 | | $808.50 | | |
| Remove Broken Mirror | | $125.00 | | $144.38 | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **HVAC** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **ELECTRICAL** | $519.75 | $450.00 | | | | |
| Replace Damaged Outlets 3Ea. | 3 | $150.00 | $450.00 | $173.25 | $519.75 | $0.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **PLUMBING** | | | | | | |
| | | | | | | |
| | | | | | | |
| **ACOUSTICAL** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **DRYWALL CONSTRUCTION** | $1,645.88 | $1,425.00 | | | | |
| Point-up and Patch Walls Throughout Premises | 1 | $1,425.00 | $1,425.00 | $1,645.88 | $1,645.88 | $0.01 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **DOORS, FRAMES & HARDWARE** | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Description | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Replace 8' x 4' Mirror in South End Mens RR | | | | | $721.88 | $721.88 | | $0.01 |
| **MILLWORK** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **WALL FINISHES** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **FLOOR FINISHES** | $3,753.75 | $3,250.00 | | | | | | |
| Install Approx . 2000 Sqft VCT Flooring South End 2 Rooms Near Front | 1 | | $2,800.00 | $2,800.00 | $3,234.00 | $3,234.00 | | $0.03 |
| Add New Rubber Cove Base | 1 | | $450.00 | $450.00 | $519.75 | $519.75 | | $0.00 |
| **FIRE PROTECTION** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **GENERAL CONDITIONS & FEES** | | | | | | | | |
| Supervision | | | | | | | | |
| Clean Up | | | | | | | | |
| Permit | | | | | | | | |
| Lien Agent, Insurance, Printing | | | | | | | | |
| Owner Provided Dumpster | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | TOTAL COST | $5,750.00 |
| | | | | | | | SALES PRICE | $6,641.25 |
| | | | | | | | PROFIT MARGIN | $891.25 |

*INTERIORS GROUP - RECAP SHEET*

Date:     December 13, 2017
Client:     Adler KAWA Real Estate Services
Tenant:    AKF2 Shopton, LLC
Building:   3915 Shopton Road Charlotte, NC 28217
Estimator:  Kirk Krone
Square Footage:  102,400

| Upfitting Allowances | Per Trade Sales Cost | Per Trade Cost/PSF |
|---|---|---|
| DEMOLITION & SITEWORK | | |
| HVAC | | |
| ELECTRICAL | $519.75 | $0.01 |
| PLUMBING | | |
| ACOUSTICAL | | |
| DRYWALL CONSTRUCTION | $1,845.88 | $0.02 |
| DOORS, FRAMES & HARDWARE | | |
| GLAZING | $721.88 | $0.01 |
| MILLWORK | | |
| WALL FINISHES | | |
| FLOOR FINISHES | $3,753.75 | $0.04 |
| FIRE PROTECTION | | |
| GENERAL CONDITIONS & FEES | | |
| TOTALS | $6,641.25 | $0.06 |



# SOUTHERN COMFORT OF CHARLOTTE

POST OFFICE BOX 34034
CHARLOTTE, N.C. 28234
PHONE (704) 423-8870
FAX (704) 423-8873

August 27, 2014

Pinpoint Warehousing, Inc.
3915 Shopton Ridge
Charlotte, NC 28217

Attn: Mr. Zach Gantt

Re:  Maintenance Service Inspection

Dear Mr. Gantt:

For your consideration and evaluation we offer the following service maintenance proposal for your heating and air conditioning equipment. A maintenance agreement will entitle you to our *Priority Service* when unforeseen problems occur. You will also be able to take advantage of our *Preferred Customer Discount* on parts and materials.

## FREQUENCY OF INSPECTION
- Quarterly (Winter, Spring, Summer, Fall)

## EQUIPMENT TO BE SERVICED
- 24 Lennox RTUs
- 10 Mitsubishi Ductless Units
- 3 Split Systems
- 8 Small Exhaust Fans
- 3 Large Exhaust Fans
- 1 Heat Recovery Make-up

## WORK TO BE PERFORMED
- Inspect equipment in seasonal mode of operation
- Make minor adjustments when necessary
- Clean or change filters quarterly
- Check condition of belts
- Lubricate equipment as required
- Check drain pan for any debris
- Check airflow through evaporator and condenser coils
- Check fan motors for proper operation
- Check refrigerant circuit

HEATING  •  VENTILATION  •  AIR CONDITIONING

**Carolina Lock & Access Control LLC**

5010 Crestland Ave.

Charlotte, NC 28269

(704)525-5511

customerservice@carolinalock.com

# Carolina Lock
## &
## Access Control LLC

**Invoice**

| BILL TO |
|---|
| AKF 2 Shopton LLC |
| 3915 Shopton Rd |
| Vacancy |

| SHIP TO |
|---|
| AKF 2 Shopton LLC |
| 3915 Shopton Rd |
| Vacancy |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 017144 | 12/12/2017 | $218.79 | 12/12/2017 | Due on receipt | |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 12/12/2017 | **Trip Charge Reg.**<br>Trip Charge | 1 | 69.00 | 69.00T |
| 12/12/2017 | **Rekey Com.**<br>Rekey Cylinder Com. | 6 | 15.00 | 90.00T |
| 12/12/2017 | **Keys**<br>Keys | 15 | 3.00 | 45.00T |

3915 Vacant building

| | |
|---|---|
| SUBTOTAL | 204.00 |
| TAX (7.25%) | 14.79 |
| TOTAL | 218.79 |
| BALANCE DUE | **$218.79** |

Paid 12/12/17









